UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

ANATOLY VALENKO,                                    :

          Petitioner-Appellant            :

            -against-                           :

DALE ARTUS, Superintendent of Attica              :
      Correctional Facility,
                                :

          Respondent-Appellee.

-----------------------------------------------------------------x

## PETITION FOR A WRIT OF HABEAS CORPUS
## BY A PERSON IN STATE CUSTODY

To the Honorable Judge of the United States District Court for the Eastern

District of New York:

## PROCEDURAL HISTORY

1.     Petitioner was convicted in the Supreme Court of the State of New York,

Kings County.

2.     The date of the judgment of conviction was December 13, 2011.

3.     Petitioner was sentenced under one count of one indictment.  He was not

sentenced on more than one indictment in the same court at the same time.

4.     Petitioner is currently incarcerated in the custody of the New York State

Department of Corrections and Community Supervision, DIN 11-A-5833, while he

serves a term of life in prison without the possibility of parole.

5.      Petitioner was convicted, after a jury trial, of one count murder in the first degree [N.Y. Penal Law § 125.27(1)(a)(viii)]  (Goldberg, J., at trial and sentencing).

6.      The facts of petitioner's appeal from the judgment are as follows:

(a)      Petitioner appealed his conviction to the Appellate Division of the Supreme Court of the State of New York, Second Department.

(b)      The Appellate Division affirmed petitioner's conviction on March 25, 2013. People v. Valenko, 126 A.D.3d 1020, 6 N.Y.S.3d 142 (2d Dept. 2015).  A copy of that decision is attached as Exhibit A.

(c)      Copies of the Brief for Defendant-Appellant, Respondent's Brief, and the Reply Brief for Defendant-Appellant are attached as Exhibits B, C, and D.

(d)      Leave to appeal to the New York State Court of Appeals was denied on June 16, 2015, People v. Valenko, 25 N.Y.3d 1172, 36 N.E.3d 107 (2015).  A copy of the application papers, the State's response, and the Order Denying Leave are attached collectively as Exhibit E.

7.      Aside from the direct appeals from the judgment and the resentencing, petitioner has not filed any actions with respect to that judgment in any state court.

## STATEMENT OF FACTS

Introduction

Appellant Anatoly Valenko was extradited from the Netherlands fourteen years after the murder and dismemberment of two of his former roommates.  A fourth roommate, Vladimir Balachov, who lives in Russia and cannot be extradited, was seen dumping the dismembered torsos of the victims in a park in New Jersey days after they disappeared.  The only evidence against Mr. Valenko was that he was injured in a fight the night the victims disappeared, lied about his injuries, and lied about where one of the victims had gone, before carrying through on previously made plans to leave the United States for his home country of Ukraine.

At the close of his jury trial, and in the absence of any evidence either that more than one person had committed the murders or that Mr. Valenko had engaged in any relevant activity that involved another person, the court instructed the jury, over objection, regarding acting in concert.  Although viewed in the light most favorable to the prosecution, the evidence against Mr. Valenko established only that he knew something about the disappearance of the deceased and did not prove beyond a reasonable doubt that he killed them, he was convicted of murder in the first degree.  The court sentenced Mr. Valenko, a first-felony offender with mental illness, to a term of life in prison without the possibility of parole.

<u>The Trial</u>

Before opening statements, the court informed the parties that it was entertaining the possibility of instructing the jury during the final charge on accomplice liability (VD. 33).[1]  While the court did not expect that the prosecution would be eliciting evidence that someone other than Mr. Valenko participated in  the crimes charged, it felt that the acting in concert instruction might be necessary so that the jury would not conclude that it must acquit if it found that Mr. Valenko did not act alone (VD. 36-37). The court claimed to be concerned that the jury might acquit even though "it is not a defense to a crime to say 'I did it with someone else, therefore, I am not guilty'" (VD. 33).

The prosecutor argued that, under New York law, amending an indictment to allege acting in concert "is not a change in theory of the case" (VD. 34).  Defense counsel countered that adding an acting in concert instruction would amount to a dramatic last-minute change of the prosecution's theory of the case (VD. 35).  Although the prosecutor noted that the "accomplice" box was checked on the Voluntary Disclosure Form (VD. 34; <u>see</u> Supreme Court file), defense counsel argued that the Bill of Particulars clearly stated the prosecution's position that Mr. Valenko acted alone both in killing the decedents and in dismembering their bodies (VD. 35; <u>see</u> Supreme Court file).  Counsel also referred to a lengthy statement made by Vladimir Balachov when the police interviewed him in Russia in which he denied any knowledge about the killings but made

---

[1]      Unprefixed numbers in parentheses refer to pages of the trial transcript; numbers preceded by "VD." refer to pages of the <u>voir</u> <u>dire</u> that immediately preceded the trial.

statements that were vaguely inculpatory of Mr. Valenko (VD. 35).  It was counsel's understanding that the prosecution intended to call Balachov to the stand (VD. 35).  The prosecutor did not dispute this, and Balachov was on the prosecution's witness list (VD. 18).  The court nevertheless ruled that it would give the charge (VD. 37).

The next day, after defense counsel had given thought to the court's ruling, he reiterated that the addition of an acting in concert charge at this late date had sand-bagged the defense; he had been preparing for trial on the basis of the prosecution's consistent position that Mr. Valenko had acted alone (VD. 241-42).  Counsel again referred to the Balachov statement and the fact that he was being treated by the prosecution as an innocent party (VD. 244, 245).

Defense counsel then asked that the court reconsider its charge and "just charge this as a normal circumstantial evidence case" (VD. 247).  The court, noting that the prosecution had the burden of excluding Balachov as having committed the crime alone but did not have to prove that Mr. Valenko committed it alone, promised to "give a normal charge" (VD. 247).

The Prosecution's Case

The Disappearance of Larisa Jakovleva and Fakhat Askerov

Ludmila Iodko, a Latvian immigrant, knew Larisa Jakovleva as the wife of a fellow student, and became friends with her when the two came to the United States in 1994-95 (42, 43).  In October 1995, Ms. Jakovleva, who had gotten a divorce, met her boyfriend

from New Jersey, "Oscar," a/k/a Fakhat Askerov, and the two moved into an apartment in Brooklyn (45, 46). They shared the apartment with Mr. Valenko, whom Ms. Iodko identified in court, and a man she knew as "Latina", a/k/a Vladimir Balachov (46, 48).[2]

At about 10:00 a.m. on Sunday, November 12, 1995, Ms. Iodko, Mr. Askerov and Ms. Jakovleva tried to go to New Jersey to pay some of Mr. Askerov's bills, but traffic was so heavy they turned around and went back to Brooklyn (49-50). They parked Mr. Askerov's car in the parking garage behind the apartment building (52). Mr. Askerov went to a hardware store to buy a new lock for the apartment and Ms. Iodko and Ms. Jakovleva went to a grocery store to buy food for lunch and dinner (51). Ms. Iodko had dinner with them at 6:00 p.m. or 7:00 p.m. at their apartment, then the three went to visit other friends, Alexander and Marina (51, 64). Ms. Iodko, Ms. Jakovleva, and Mr. Askerov then walked to the parking garage with Alexander, who was to drive Ms. Iodko home (51-52). Before they parted, Ms. Jakovleva asked Ms. Iodko to call her the next day (53). As Ms. Iodko left at 10:00 p.m., she saw Ms. Jakovleva and Mr. Askerov walking home; they left Mr. Askerov's car where they had parked it earlier (52-53).

"Late at night, about 10, 11 p.m.," Mr. Valenko came to his landlord Alla Perevorukhova's Brooklyn apartment asking for the key to his apartment because he had been robbed by black men who had taken his keys and wallet (324, 325). Mr. Valenko

---

[2]       The defense did not dispute that Mr. Valenko, Fakhat Askerov, Vladimir Belachov, and Ms. Jakovleva subleased the apartment from Alla Perevorukhova (319, 322-23; see Det. Michael Prokopiw, 136).

could not describe his assailants (326; see 339).  "He looked pretty nervous, his hands were shaking, his face was really scratched" and "he used to have [an] earring in his ear [but] there was no earring and it was bloody" (325; see 338).  Mr. Valenko, who was 5 feet, 9 inches tall, with a "medium, good-looking buil[d]," told her he had punched the man who assaulted him and he was concerned that he might have killed the man (326, 338).  Mr. Valenko also told her that Mr. Askerov had put an additional lock on the door (328).[3]  Ms. Perevorukhova cleaned him up and gave him the apartment key and cab fare to get home (326).  She testified that it would have taken Mr. Valenko 30 to 40 minutes to walk from his apartment hers (342-43).

The following day, Ms. Iodko called Ms. Jakovleva many times, starting at 8:00 a.m. but got no answer (53).  At 8:00 p.m., when she called again, Mr. Valenko answered the phone and informed her that some relatives had come to visit the day before, and that Ms. Jakovleva went with them to another state (54).  He did not say who the relatives were or what time of day they arrived (54).

Mr. Valenko called Ms. Iodko on Tuesday to tell her that Ms. Jakovleva and Mr. Askerov had left the apartment without paying their share of the rent (55-56).  He asked Ms. Iodko if she could help pay their share and offered to supply a video camera as collateral (56).  Although Ms. Iodko was reluctant because she "wasn't really sure what

_____

[3]     When Ms. Perevorukhova was asked whether Mr. Valenko told her anything about the whereabouts of his roommates, she testified that Mr. Askerov had "put an additional lock," and then said "He mentioned that he was involved in some criminal activities."  Because it is impossible to tell whether the second "he" in that sentence refers to Mr. Askerov, as is likely from the context, or to Mr. Valenko, Mr. Valenko does not rely on that testimony in this petition.

7

[wa]s going on," she agreed to meet him at a nearby subway station to give him some money (56). When Mr. Valenko arrived, she saw he had parallel scratches, and dark bruises, on his face (57). Mr. Valenko explained that he was taking kickboxing lessons and got those injuries during practice (57).

Because "nothing was fitting together," and she doubted that Ms. Jakovleva and Mr. Askerov would go out of state without their car, Ms. Iodko went to the parking garage to check on it (59). She found the car where Mr. Askerov had parked it and in the same condition: with her soda, snack wrappers, and a raincoat, "the same way I left it" (59).

Ms. Iodko identified herself sitting on a suitcase belonging to Ms. Jakovleva in a photograph introduced into evidence as People's Exhibit # 8 (59). The photograph had been taken inside Ms. Jakovleva's apartment (59).

A "couple" of days after Ms. Perevorukhova had given Mr. Valenko the key to his apartment, Mr. Valenko called and arranged to give the apartment key back to her (329). She met him on Jay Street, received the keys and gave Mr. Valenko more money; her loans to him amounted to $400 in all (329-30).

Ms. Perevorukhova went to Mr. Valenko's apartment on November 18, 1995 (330). The lock had not been changed and no new lock had been added (330-31). Towels, bedspreads and sheets were missing from the apartment and the old, green, foyer

carpet was gone (331, 336).  She had last seen the carpet in October, and the apartment looked better without it (331).  The apartment was vacant and  clean (331).

                    The Police Investigation

On November 14, 1995, TIMMY HALL was walking through the South Mountain Reservation, a state park in New Jersey, when he saw a white man taking suitcases out of a blue or black pickup truck (243-44, 247).  Mr. Hall was 30 feet from the man, "a thin-frame person," weighing 130 pounds at most, who had dark hair and a goatee (246, 248).  Mr. Hall watched, in good light and a clear view, as the man struggled with two suitcases, dragging them with both hands, one at a time, about 20 feet from the parking area.  The man left the suitcases there, closed the tailgate, and drove away hurriedly (247, 249-50, 251, 252-53).

Curious, Mr. Hall walked over to the suitcases and touched one (253).  It felt like a human body, so he called his friend KAREN FROHBOSE, an E.M.T., and asked her to come to the park (Hall 252; Frohbose 9, 11).  Ms. Frohbose opened one of the suitcases, saw that it contained a human torso, and called the police (Hall 253, Frohbose 12).

Former New Jersey Detective MICHAEL PROKOPIW and Investigator Jim Gold were called to the scene (124, 126).  Uniformed officers already present informed them that there were two suitcases in the park with a human torso in each (124).  Detective

Prokopiw observed that the head, hands, and feet of each body had been removed (127). The torsos were sent to the Medical Examiner's office (126).

On November 16, 1995, ANNA LADISHENSKAYA was walking her dogs on Plum Beach in Brooklyn when one of them ran into the water and started to bark (90, 92-93). She went to investigate and saw, in the water, a human leg and foot that had been cut cleanly from a body below the knee (93-94). Ms. Ladishenskaya called the police (94). When former Detective ARTHUR SEMIOLI arrived, he saw not only the foot that Ms. Ladishenskaya had found, but a male human head, as well (Semioli 100). Former Police Officer WILLIAM MENENDEZ took photographs of those body parts laying on the beach, which were introduced into evidence and published to the jury by overhead projector (Semioli 101; Menendez 172; P. Exhs. # 9-12). Those body parts were sent to the Medical Examiner's office in Brooklyn (Semioli 103; Menendez 173). Detective JAMES McCAFFERTY also went to Plum Beach to investigate the discovery of the body parts (176). The police searched Plum Beach on foot and by helicopter but found no additional evidence (McCafferty 176; Menendez 173).

The next day, November 18, 1995, Detective Semioli took the head and foot to the Essex County New Jersey Medical Examiner's office for comparison with the torsos found in the reservation (104; see Prokopiw 132). The detective "put the head on top of the spinal column, and there was a match" (104).

10

New Jersey Detective Prokopiw engaged the services of IRA TITUNIK, a forensic dentist who examined the head and took X-rays (218). On a hunch, the detective went to a dentist who had an office across from the Ivy Hill Apartments, which were in an Eastern European section of Newark not far from the reservation where the head had been found (132). He interviewed that dentist who identified the head as belonging to Fakhat Askerov (133). Mr. Titunik compared Mr. Askerov's dental records with the results of his examination of the head and confirmed that identification (231). Mr. Hall later viewed a photo array that included a photograph of Vladimir Balachov, one of Mr. Askerov's roommates, and identified him as the man who had brought the suitcases to the park (Hall 257; Prokopiw 135-36; P. Exh. # 16).

Detective Prokopiw did a background check and discovered the address of the apartment in which Mr. Askerov lived (134). As a result, in February 1996, it was determined that the N.Y.P.D. would continue with the investigation (134).

Sometime during February 1996, Detective McCafferty visited Rio Cutlery & Luggage, a store in Manhattan, to investigate a purchase that had been made with Mr. Askerov's credit card on November 16, 1995 (177, 179).

Mitchell Weingand, a sales manager at Colony Hardware in Brooklyn, testified at trial, 16 years later, that on Monday, November 13, 1995, he sold a Skill 5150 7 1/4" circular saw to "two gentlemen slight of build, one slighter than the other, similar looking. One maybe with sandy blonde hair, kind of greasy looking, the other more stocky" (75).

A credit card receipt, dated November 13, 1995, showed a charge of $75 on a credit card belonging to Fakhat Askerov paid to Colony Hardware (76, 78). Although the receipt was not itemized, that amount was consistent with the purchase of a circular saw (77). As Colony Hardware was located in Brighton Beach, a predominately Russian neighborhood, Mr. Weingand easily recognized that the men had strong Russian accents. "As a matter of fact, their English was not very good" (79).

On February 26, 1996, Detectives McCafferty and Semioli, together with Crime Scene officers, went to Mr. Askerov's apartment to examine it (McCafferty 131; Semioli 105). The apartment was vacant, but some furniture was present and Detective Semioli noticed stains on a sofa and bed sheet (107). (McCafferty 181). There was no carpet in the foyer (Semioli 107).

The police sprayed a chemical called luminol onto various surfaces within the apartment to test for the presence of blood or other bodily fluids (McCafferty 188; Semioli 108). According to Detective McCafferty, when the chemical comes into contact with such fluids it becomes visibly detectable in the presence of a particular light source (188). In this case, when the luminol was applied to one of the foyer walls, "there was a large area that li[t] up" (McCafferty 186, 188; Semioli 108, 109; P. Exhs. 17, 30, 33). The luminol emitted a blue luminescence, revealing semi-circular wiping patterns and several small droplets (McCafferty 189, 191; Semioli 108, 114). While Detective Semioli testified that this was consistent with the presence of blood (Semioli 109), both detectives

12

admitted that luminol reacts with other bodily fluids and fluids from animals as well as other substances (McCafferty 205, Semioli 115). The detectives did not photograph the luminol reaction or make a contemporaneous memorialization of it (Semioli 114; McCafferty 206-07).

The crime scene detectives then removed a metal door saddle from one of the doorways leading into the foyer (McCafferty 192). This exposed the carpet and carpet padding that was underneath, which was also removed (192). Finally, the police recovered and vouchered a pillow, bedspread and seat cushion (192).

ASAKO ISHII, a Criminalist in the Office of the Chief Medical Examiner, testified that her office conducted DNA tests on various samples related to this case (279-81). The office was able to generate one male DNA profile from blood found on the seat cushion, metal door saddle, and carpet (279-80), and one female DNA profile from blood found on the bedspread (279-80, 285). Those profiles were then compared with DNA profiles generated from tissue samples taken from the torsos and body parts in New Jersey (280). Ms. Ishii testified, to a reasonable degree of scientific certainty, that the male apartment profile matched the profile from the male torso (281-82), but that the female profile from the apartment did not match the severed leg (287). The leg profile did, however, match a profile generated from the female torso in New Jersey (287). Ms. Ishii confirmed on cross-examination that luminol reacts to bleach (293). Ms. Iodko, however, testified that Ms. Jakovleva had a birthmark on her neck and recognized that

13

birthmark in a redacted photograph of the neck area of the female torso (450; P. Exh.
52).  Ms. Iodko also identified the head on the beach as Mr. Askerov (450; P. Exh. 12).

Detective McCafferty and former detective <u>ROBER SOMMER</u>, attempted to
locate Mr. Valenko and Mr. Balachov (McCafferty 194; Sommer 154).  They discovered
that they, along with Mr. Askerov, had lived in the Ivy Hill Towers apartment complex
before moving to Brooklyn (195).  They were unable to develop any leads as to their
current whereabouts until they learned that Mr. Valenko had written a letter to his
landlord indicating that he was going to California (195).   Since calls to a California
phone number had been placed from Mr. Valenko's apartment, the detectives went there
in search of him, but without results (Sommer 156).

In May of 1997, Detective McCafferty was advised that Mr. Valenko was living in
Kiev, Ukraine (197).   Mr. Valenko had reported his passport stolen in May of 1995, and
had been issued a temporary certificate for return to the Ukraine on November 13, 1995
(209).  Detective McCafferty sought permission to travel there to interview him but local
authorities refused to authorize that contact (197).   The detective also learned that
Mr. Balachov was living in St. Petersburg, Russia, but the United States had no
extradition treaty with Russia and he was not given permission to travel there to interview
Mr. Balachov (198).

Ten years later, in 2007, Detective McCafferty was advised by Interpol that Mr.
Valenko was then residing in the Netherlands (199).   The detective traveled to the

Netherlands and found Mr. Valenko in Dutch custody in Gouda on an extradition order
in this case (200).  Mr. Valenko was extradited to the United States in 2008 for trial (201).

The Autopsy

CARLOS FONSECA, a forensic pathologist who worked for the Essex County
New Jersey Medical Examiner's Office, conducted an autopsy of the male torso (383).
He described it as

> the dismembered and the decapitated body of a young male,
> and it was clad in a pair of boxer shorts; and it was obvious
> that there were several multiple stab wounds to the chest and
> to the torso.
>
> *   *   *
>
> Around the waist was wrapped a large plastic bag; also,
> under one of the arms was another plastic bag of similar
> characteristics; and there was also a rope tied around the waist
> (384-85).

Mr. Fonseca identified five stab wounds, one penetrating 5 ½ inches into the chest
and puncturing the lung, and another penetrating as deep and cutting into the heart (386,
388).  The other three wounds were superficial (386).  The stab wounds preceded death
and the dismemberment wounds were consistent with the use of a serrated tool such as
a circular saw (393).  The stomach contents were consistent with a time of death within
"a few" hours of a meal (394).

The female torso had suffered five stab wounds: four in the area of the neck and
one in the upper arm (402).  They ranged from ½" to 2" deep, one severing the jugular

15

vein, causing death (403).  The torso was clad only in bra and panties and had a rope tied around the waist (404).  The characteristics of the dismemberment were similar to that of the male torso in that the head was severed at the clavicle and the wounds bore indications that a serrated tool was used (406).

<u>Motion for a Trial Order of Dismissal</u>

Defense counsel moved to dismiss all counts on the ground there was insufficient evidence to support a conviction (457-58).  Specifically he argued that the prosecution had introduced no evidence of intent and had made out "no nexus between the defendant and the actors," either as the perpetrator or as an accomplice (458).  He also specifically argued that there was no evidence of interaction between Mr. Valenko and Vladimir Balachov that would support an acting in concert conviction.  "[M]ere presence or merely being a roommate just wouldn't cut the mustard" (459).  Finding that there was "sufficient circumstantial evidence to allow the case to go to the jury," the court denied the motion.

<u>Charge, Deliberations, Verdict and Sentence</u>

As he had done at the start of the case, defense counsel, at the charge conference immediately following his motion for a trial order of dismissal, objected to an acting in concert instruction because there was "not a scintilla of evidence that Balachov did anything with respect to the homicides" (463, 464).  Counsel specifically objected to a

charge that would imply that Mr. Valenko could be found guilty if he "solicited, requested, commended or intentionally aided" the killer (464).

The court rejected counsel's argument (463-64), then gave the standard New York pattern instruction on acting in concert as follows:

> In this case, based on the evidence you heard at the trial, it is unknown whether there was more than one person who committed the crimes charged. The People have to prove beyond a reasonable doubt that the defendant committed the crimes charged, but they do not have to prove whether or not other persons also participated in these crimes.
>
> Our law recognizes that two or more individuals may act jointly to commit a crime, and that in certain circumstances each can be held criminally liable not only for the person's own acts but also for the acts of the other person. In that situation, those persons can be said to be acting in concert with each other.
>
> Our law defines the circumstances under which one person may be criminally liable for the conduct of another. That definition is as follows: When one person engages in conduct which constitutes an offense, another is criminal[ly] liable for such conduct when acting in a state of mind required for the commission of that offense he solicits, request, commands, importunes or intentionally helps or aids such person to engage in such conduct.
>
> Under that definition, mere presence at the scene of the crime, even with knowledge that the crime is taking place, or mere association with a perpetrator of a crime does not by itself make a defendant criminally liable for that crime.
>
> In order for the defendant to be held criminally liable for the conduct of another person which constitutes an offense, you must find beyond a reasonable doubt (1) that the

17

defendant solicited, requested, commanded, importuned or intentionally aided such other person to engage in that conduct; and (2) that the defendant did so with the state of mind required for the commission of the offense.

If it is proven beyond a reasonable doubt that the defendant is criminally liable for the conduct of another, the extent or degree of the defendant's participation in the crime does not matter.

A defendant proven beyond a reasonable doubt to be criminally liable for the conduct of another in the commission of a crime is as guilty of the crime as if the defendant personally had committed every act constituting the crime.

The People have the burden of proving beyond a reasonable doubt that the defendant acted with the state of mind required for the commission of the crime, and then either personally or by acting in concert with another person committed each of the remaining elements of the crime.

Your verdict, whether guilty or not guilty, must be unanimous in order to find the defendant guilty; however, you need not be unanimous on whether the defendant committed the crime alone or by acting in concert with another person.

(556-58).  See New York Criminal Jury Instructions 2 (Accessorial Liability).

After defining the terms "intent," "criminal transaction," and "serious physical injury," the court instructed the jury concerning the elements of murder in the first degree as follows:

in order for you to find the defendant guilty of Murder in the First Degree, the People are required to prove from all of the evidence in the case, beyond a reasonable doubt, each of the five elements: (1) That on or about November 12th, 1995, in the county of Kings, the defendant, either personally or acting

18

in concert with another person or persons, caused the deaths of Fakhat Askerov and Larisa Jakovleva by stabbing them; (2) that the defendant did so with the intent to cause the death of Fakhat Askerov and the intent to either cause the death or serious physical injury to Larisa Jakovleva; and (3) that the defendant caused both deaths during the same criminal transaction; and (4) that neither victim was a participant in the criminal transaction; and (5) that the defendant was more than 18 years old at the time of the commission of the crime (564-65).

During deliberations, the jury reviewed all exhibits, received read-backs of testimony by Mitchell Weingand, Asako Ishii, Alla Perevorukhova, and Ludmilla Iodko (583-84), and was twice reinstructed on first- and second-degree murder (580, 583-97, 617). After several hours of deliberations over the course of two days, the jury found Mr. Valenko guilty of murder in the first degree (624-26). Defense counsel filed a motion pursuant to C.P.L. § 330.30 to vacate the conviction. In pertinent part, counsel argued that the court's acting in concert instruction was untimely and improper given the prosecution's long-held position that Mr. Valenko acted alone and that the prosecution had presented insufficient proof that Mr. Valenko was the person who killed Ms. Jakovleva and Mr. Askerov (November 21, 2011 Notice of Motion and Affirmation, in Supreme Court file). At sentencing, the court, finding that "these points were all discussed at the trial," denied the motion (S. 3, 4).

The Appellate Division's Decision

On direct appeal, citing the Fourteenth Amendment and <u>Jackson</u> v. <u>Virginia</u>, 443 U.S. 307 (1979),  Mr. Valenko argued that since "there was no evidence connecting Mr. Valenko either to the murders or to the dismemberment of the bodies," the State had "failed . . . to elicit sufficient proof of Mr. Valenko's guilt of any of the charged crimes" (Exhibit B at 25).  He also argued, citing the Fourteenth Amendment and <u>Matthews</u> v. <u>United States</u>, 485 U.S. 58 (1988),  <u>inter</u> <u>alia</u>, that the trial court violated Mr. Valenko's right to Due Process by giving an acting in concert charge, over objection, in the absence of any evidentiary foundation (Exhibit B at 34).

The Appellate Division affirmed Mr. Valenko's conviction by finding that there was sufficient circumstantial evidence to establish his guilt beyond a reasonable doubt and that "[t]he trial court properly instructed the jury on accomplice liability inasmuch as there was a reasonable view of the evidence to support the charge (Exhibit A at 1, 2 (internal quotations omitted)).

**A.   GROUNDS OF UNCONSTITUTIONALITY OF PETITIONER'S CONVICTION AND SENTENCE**

POINT I

PETITIONER WAS DENIED HIS FOURTEENTH AMENDMENT RIGHT TO BE CONVICTED ONLY UPON EVIDENCE SUFFICIENT TO ESTABLISH HIS GUILT BEYOND A REASONABLE DOUBT WHEN, IN THE ABSENCE OF ANY DIRECT EVIDENCE OF HIS PARTICIPATION IN THE CHARGED MURDERS, THE STATE RELIED WHOLLY ON CIRCUMSTANTIAL EVIDENCE THAT HE WAS IN A FIGHT THE NIGHT THE DECEASED DISAPPEARED, THAT HE LIED ABOUT THE FIGHT AND ABOUT WHERE ONE OF THE DECEASED HAD GONE, THAT HE LEFT THE COUNTRY SOON AFTER THE DECEASED DISAPPEARED, AND THAT HIS REMAINING ROOMMATE DISPOSED OF THE BODIES.

Mr. Valenko was tried for murder in the first- and second-degrees based entirely on circumstantial evidence related to the deaths of his roommates Fakhat Askerov and Larisa Jakovleva in 1995, 16 years earlier.  Although Vladimir Balachov, the fourth roommate, was seen disposing of their dismembered bodies shortly after their disappearance, the State's theory was that it was Mr. Valenko who killed them.  The only evidence the prosecution introduced at trial was that Mr. Valenko had been involved in some physical confrontation around the time Mr. Askerov and Ms. Jakovleva disappeared, that he lied about that confrontation and about Ms. Jakovleva leaving town with relatives, and that he left the country shortly after their disappearance.  None of that evidence connected Mr. Valenko to a murder.  Nor did it connect him to the

dismemberment of the bodies; it was Balachov alone who was seen dumping them in a park in New Jersey. At most, the trial evidence established only that Mr. Valenko was hiding something. The State failed, therefore, to elicit sufficient proof of Mr. Valenko's guilt of first-degree murder. Since appellant's conviction under these circumstances violated his constitutional right to be convicted only upon proof beyond a reasonable doubt, and the affirmance of that conviction was an unreasonable application of clearly established federal law as determined by the United States Supreme Court, this Court should grant the petition. U.S. Const., Amend. XIV; N.Y. Const., Art. I, §6; Jackson v. Virginia, 443 U.S. 307 (1979).

A state prisoner is entitled to habeas corpus relief if his conviction "was contrary to, or involved an unreasonable application of, clearly established law, as determined by the Supreme Court." 28 U.S.C. §2254(d). When the issue is whether the evidence was sufficient to sustain the State's burden of proof, the applicable Supreme Court standard is that of In re Winship, 397 U.S. 358 (1970), and Jackson v. Virginia, 443 U.S. 307 (1979): "[t]he standard of review of a sufficiency claim by a federal habeas court is 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Wheel v. Robinson, 34 F.3d 60, 66 (2d Cir. 1994) (quoting Jackson, 443 U.S. at 319); see also United States v. Lindsay, 985 F.2d 666, 672 (2d Cir.), cert. denied, 510 U.S. 832 (1993).

Therefore, a petitioner is entitled to relief under 28 U.S.C. §2254 if "upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 324. A claim that the evidence was insufficient to establish proof of first-degree murder is thus cognizable under AEDPA, with the essential question being whether the state courts' finding of sufficient evidence to prove Mr. Valenko's guilt was an unreasonable application of the Winship/Jackson rule. Policano v. Herbert, 507 F.3d 111, 115-116 (2d Cir. 2007).

"When it considers the sufficiency of the evidence of a state conviction, '[a] federal court must look to state law to determine the elements of the crime.'" Fama v. Comm'r of Corr. Servs., 235 F.3d 804, 811 (2d Cir. 2000) (quoting Quartararo v. Hanslmaier, 186 F.3d 91, 97 (2d Cir. 1999), cert. denied, 528 U.S. 1170 (2000)). The state law must be assessed as of the time the defendant's conviction became final, which, in a New York case, does not occur until after leave to appeal to the New York Court of Appeals has been denied. Policano v. Herbert, 7 N.Y.3d 588, 593, 825 N.Y.S.2d 682, 681 (2006) (noting, in a decision on a question certified by the Second Circuit Court of Appeals, that the defendant's conviction became final 90 days after leave denial, citing Clay v. United States, 537 U.S. 522, 527 (2003)). Mr. Valenko's appeal was decided by the Appellate Division on March 25, 2015, and he was denied leave on June 16, 2015.

Under New York Law applicable at the time Mr. Valenko's conviction became final, he could be found guilty of murder in the first degree under N.Y. Penal Law

§§ 125.27(1)(a)(viii) & (b) only if the following elements were proven beyond a reasonable doubt:

> 1.  With intent to cause the death of another person, he causes the death of such person or of a third person; and . . . (a) . . . (viii) as part of the same criminal transaction, the defendant, with intent to cause serious physical injury to or the death of an additional person or persons, causes the death of an additional person or persons; provided, however, the victim is not a participant in the criminal transaction . . . and (b) The defendant was more than eighteen years old at the time of the commission of the crime.

In New York, when reviewing the legal sufficiency of the trial evidence, the appellate court must "determine whether any valid line of reasoning and permissible inferences could lead a rational person to the conclusion reached by the fact finder on the basis of the evidence at trial, viewed in the light most favorable to the People." People v. Williams, 84 N.Y.2d 925, 926 (1994); see People v. Hepp, 40 A.D.3d 880, 881-882 (2d Dept. 2007). In a case based solely on circumstantial evidence, the verdict must be strictly scrutinized "to ensure that the jury has not relied upon equivocal evidence to draw unwarranted inferences or to make unsupported assumptions." People v. Way, 59 N.Y.2d 361, 365 (1983); see also People v. Kennedy, 47 N.Y.2d 196, 202 (1979) ("close judicial supervision is necessary to ensure that the jury does not make inferences which are based not on the evidence presented, but rather on unsupported assumptions drawn from evidence equivocal at best"). The trier of fact may not "leap logical gaps in the

proof offered and draw unwarranted conclusions based on probabilities of low degree."
People v. Benzinger, 36 N.Y.2d 29, 32 (1974).

In this case, the jury could have found that it was Mr. Valenko who killed Mr. Askerov and Ms. Jakovleva only by "leap[ing] logical gaps in the proof." Benzinger, 36 N.Y.2d at 32. The State presented no evidence, direct or circumstantial, linking Mr. Valenko to the murder of his roommates.

It was the fourth roommate, Vladimir Balachov, who was seen — alone — dumping the torsos in a park near where he, as well as Mr. Valenko, once lived. Mr. Valenko was not there and the State established no connection between him and the truck Balachov used. Like Mr. Valenko, Balachov left the United States for his home country, Russia, shortly after the murders. But there was no evidence that his departure had been planned in advance, as Mr. Valenko's had been. The mere fact that Mr. Valenko once lived with Balachov near where the torsos were found was no reason at all to conclude that Mr. Valenko was involved with disposing of the torsos.

And even if there had been proof of Mr. Valenko's involvement in the disposal of the bodies, this did not prove his involvement in the underlying homicide. People v. LaBelle, 18 N.Y.2d 405, 411-12 (1966). In LaBelle, the Court of Appeals held that presence at the scene of a murder, and participation in disposing of the body afterward, was insufficient to prove the defendant's involvement in the murder. Here, there was no proof that Mr. Valenko was anywhere near the scene of the murders when they occurred.

Thus, even if he participated in the disposal of the bodies — and there was no evidence of this — he could not be found guilt of murder on that basis.

In fact, there was not even evidence of a crime scene at all, much less Mr. Valenko's proximity to it.  The State tried to suggest from the fact that the foyer rug disappeared from Apartment 2H sometime between October, when Ms. Perovorukhova last saw it, and the time of the police investigation in late November, that either the murders or the dismemberment occurred there.  Not a speck of Ms. Jakovleva's blood was found anywhere in the apartment.  And while there were specks of Mr. Askerov's blood on a seat cushion and on the saddle and carpet under one of the foyer doorways, and a luminol test revealed tiny specks and wipe-marks on a wall, there was nothing in the apartment consistent with a violent struggle and multiple stabbings and/or the dismemberment of two bodies with a circular saw.  Indeed, there was no evidence that anyone heard a circular saw being used in that apartment building prior to the torsos being found.  It would be very surprising for the police to have failed to ask the other tenants that question as soon as they found out about the purchase of the circular saw with Mr. Askerov's credit card.

While the police appeared to have put much stock in their luminol test, the State's expert admitted that luminol reacts to both animal and human liquids, not just blood, as well as other substances like bleach.  In short, the State did not prove either that the

murders or the dismemberment occurred in the apartment, or even that both murders and/or both dismemberments occurred at the same place and time.

It may be tempting to attribute meaning to the use of Mr. Askerov's credit card after his death, and the use of Ms. Jakovleva's suitcase to dispose of one of the bodies, as proof that one or both of their roommates had murdered them. But those facts are irrelevant. Mr. Askerov may well have had his credit card on his person when he was killed, so that whoever murdered him could have taken it. And, presumably, Ms. Jakovleva and/or Mr. Askerov would have been expected to have an apartment key and identification on them when they were killed. Again, whoever killed them would very likely have had access to their apartment and could have taken those items and anything else — such as the missing linens — from the apartment. And, since everyone had moved out of the apartment by the time the police investigated, there is every reason to believe that one of the roommates took the towels and linens with them, as would be expected.

Assuming, for the sake or argument, that the absence of the rug and the towels and bedclothes, suggested that they were used to clean up the mess in the apartment left by murders or dismemberment, the possibility that any of those events occurred in that apartment was irrelevant with respect to whether Mr. Valenko committed the murders. A victim's own apartment is the first place one might expect him or her to be killed, and anyone could have come there and killed Mr. Askerov and/or Ms. Jakovleva. That Mr.

Valenko shared the apartment does not make it the least bit more likely that he killed them there than that someone else did.

As for the circular saw, the State offered the testimony of the hardware store manager who described two men with thick Russian accents who were "slight of build, one slighter than the other, similar looking.  One maybe with sandy blonde hair, kind of greasy looking, the other more stocky" (75).  The State was not able to introduce evidence that Mr. Valenko was one of those two men, and the manager's description of one of them as being "slight of build" and the other "more stocky," does not fit Ms. Perevorukhova's description of Mr. Valenko in 1995 as having a "medium, good-looking buil[d]" (338).  There simply was no reasonable way for the jury to connect Mr. Valenko to either the purchase of the circular saw or the disposal of the bodies.

The State's case against Mr. Valenko boiled down, in the end, to four facts.  First, on the night Ms. Jakovleva and Mr. Askerov were last seen, only an hour later, Mr. Valenko went to Ms. Perevorukhova's apartment.  Presumably, since he had no money, he walked 30 - 40 minutes to get there.  When he arrived, he had scratches and bruises, and was upset and shaking.  He told Ms. Perevorukhova that he had been robbed and might have punched his assailant hard enough to kill him, and that he needed the spare key to the apartment.  Second, Mr. Valenko gave Ms. Iodko a different explanation for those injuries, saying he got them at kick-boxing practice.  Third,  he apparently lied to

28

Ms. Iodko about where Ms. Jakovleva had gone.  Fourth, he left the United States for his home country of Ukraine shortly after their disappearance.

Mr. Valenko clearly lied, either to Ms. Iodko, or to Ms. Perevorukhova, or both, about how he came to be injured.  He also probably lied to Ms. Iodko about relatives having visited Ms. Jakovleva the day Ms. Iodko spent with her and about her leaving with them to another state.  But even viewing those lies in the light most favorable to the State, it can be concluded only that Mr. Valenko was hiding something.   And even if it could be inferred from his actions that he knew that Ms. Jakovleva and Mr. Askerov had been killed, there is no basis for concluding that his injuries were the result of a struggle during which he killed them and that his lies were designed to conceal this.  The gap between Mr. Valenko's lies and injuries and the identity of the killer or killers could only be filled by sheer speculation.  There was no reasonable inference permitting the conclusion that Mr. Valenko caused the deaths he may have known about.

Similarly, when Mr. Valenko arrived at Ms. Perevorukhova's apartment to get the spare key, he told her that Mr. Askerov had changed or added a lock to the apartment door.  While this was not true, Mr. Askerov had indeed purchased such a lock.  Mr. Valenko could have mis-spoken in his agitated state, or Ms. Perevorukhova could have been confused about the lock actually having been installed.  But even assuming that Mr. Valenko had lied about this fact, that lie does not point to murder.

On appeal, the State argued that Mr. Valenko's arrival at Ms. Perevorukhova's apartment "an hour or less after Larisa and Fakhat were last seen alive" with his face scratched and his ear bloody where an earring had been, and telling her that he had been robbed and might have killed one of his assailants was proof of his guilt (see Respondent's Brief at 27-28). But that evidence simply did not, without improper speculation, lead to the conclusion that Mr. Valenko participated in the murders of Ms. Jakovleva and Mr. Askerov. As Mr. Valenko later told Ms. Iodko he had been scratched during kick-boxing lessons, it is clear that he was not credible. And while it may be tempting to equate his "maybe I killed a robber" statement with his guilt of having killed two of his roommates, it would be an inappropriate leap of logic to do so, particularly given the unlikelihood that there was a robbery at all.

Nor did the fact that Mr. Valenko arrived at Ms. Perevorukhova's apartment with injuries that were likely sustained in a struggle establish either the nature of that struggle, or who assaulted whom. Mr. Valenko could easily have sustained those injuries trying to prevent an assault by Balachov on the other two witnesses, or in a successful attempt to avoid ending up the third victim.

The prosecutor at trial argued that, after killing two people in a bloody struggle only minutes after they were last seen, the first thing Mr. Valenko did was to travel 45 minutes to his landlady's apartment at 11:00 pm to ask for her key to his apartment in order to prevent her from being able to enter it (see Respondent's Brief at 28). This

clever theory ignored the reality that Ms. Perevorukhova had not been to the apartment for months and would hardly have been expected to make the trip there in the middle of that particular night for no reason. Only by positing such an unlikely scenario could the prosecutor avoid the far more reasonable explanation that Mr. Valenko came to get the key because he was, in fact, locked out of his apartment. And being locked out of the apartment does not square with his being in control of a murder scene. Instead, together with his injuries, his immediate quest for the apartment key lent credence to the possibility of a struggle during which his keys were lost or stolen and someone locked him out of his apartment. That "someone" could have been with one or more of the victims, or it could have been Balachov or another person altogether. In short, nothing about Mr. Valenko's visit to his landlady's apartment pointed to his involvement in the murders. The same is true for literally all of the other circumstantial evidence the State presented at Mr. Valenko's trial.

Finally, that Mr. Valenko left the country for the Ukraine adds almost nothing. It is well-established that flight is weak evidence of guilt because even innocent people have a motive to extricate themselves from difficult circumstances. Gilmore v. Henderson, 825 F.2d 663, 666 (2d Cir. 1987). That Mr. Valenko had already planned to leave the country by reporting his passport stolen rendered this evidence weaker still.

The few facts on which the State's entire case rested proved only that Mr. Valenko was hiding something. But because there is no evidence from which to infer what he was

hiding, the State failed, in this wholly circumstantial case, to prove his guilt of murder in the face of numerous other reasonable and plausible hypotheses.[4]  These include, for example, that he had, in fact, been robbed, but was too embarrassed about the incident to admit it to Ms. Iodko.  Or perhaps Mr. Valenko was, indeed, involved in a struggle with his roommates but it was someone else — Vladimir Balachov, perhaps — who killed them, or that he had been a third intended victim of Balachov, and escaped.  It is also possible that he was the victim of an assault by Mr. Askerov and/or Ms. Jakovleva, and that Balachov came to his rescue, stabbing them to death.  Or Balachov could have attacked Mr. Askerov and Ms. Jakovleva, and Mr. Valenko got his injuries trying to defend them.  In all of these plausible scenarios, Mr. Valenko's lies, injuries, and flight are explained by a fear of wrongful prosecution or a decision not to turn his friend Balachov in to the police, out of either loyalty or fear.  Given that it was Balachov who dumped the bodies, there is no way to exclude these other explanations for the evidence the State presented.

The unusual circumstances of this case are analogous to several cases in which the Courts of Appeals have granted habeas corpus relief on insufficiency of the evidence grounds.  For example, in McKenzie v. Smith, 326 F.3d 721 (6th Cir. 2003), a case

---

[4]     See United States v. Ogando, 547 F.3d 102, 109 (2d Cir. 2008) ( [w]hile false exculpatory statements made to law enforcement officials are circumstantial evidence of a consciousness of guilt and have independent probative force . . . falsehoods told by a defendant in the hope of extricating himself from suspicious circumstances are insufficient proof on which to convict where other evidence of guilt is weak and the evidence before the court is as hospitable to an interpretation consistent with the defendant's innocence as it is to the Government's theory of guilt.").

involving a brutal assault on a three-year-old child, the principal evidence against the defendant, the child's father, was the hospitalized child's contemporaneous hearsay report to her grandmother about what "Daddy did to [her]." Id. at 723.  However, two or three days later, the child reported that "Will did it," an accusation that was excluded from evidence.  There was also circumstantial evidence that the defendant was in the child's home the morning she was assaulted and that he had been crying.  However, others were in the home at this time as well.  Because the child was found to have exhibited psychiatric problems after the assault and was incompetent to testify, the Sixth Circuit determined that her report, which lacked corroboration, could not be the basis of a conviction and that the record, as a whole, was insufficient to prove the defendant's guilt, AEDPA deference notwithstanding.  Id. at 728.

Likewise, in O'Laughlin v. O'Brien, 568 F.3d 267 (1st Cir. 2009), the evidence against the defendant, a maintenance man for an apartment complex in which he lived, and who had a master key, was accused of having brutally beaten a woman who lived two doors away was all circumstantial.  He had expressed an interest in the complainant, had noted that because she had nice furniture she must be well off, and needed money the night of the beating to buy drugs.  Id. at 291.  A neighbor who heard the woman screaming and called 911 said that no cars left the complex after he heard the screaming, and police determined that the 911 call could be heard from the complainant's apartment, explaining why nothing had been taken.  Id. at 291-92.  When the police arrived, they

33

were unable to locate the complainant's apartment but found the defendant walking outside wearing only boxers, oblivious to the near freezing temperature, and looking strange — avoiding eye contact.  When asked about the screams, he said he thought a raccoon was trapped in a dumpster so he propped a stick in it, later discovered there by the police, to allow the raccoon to escape.  Id. at 293.  He had two cuts and a small bruise on his face.  Id.

The complainant was discovered in her apartment by her boyfriend the next day. A police investigation revealed that there had been no sign of forced entry.  An aluminum baseball bat belonging to the defendant, which would have been consistent with the kind of object used to inflict the complainant's injuries, was found in the woods nearby.  There were three spots of blood on the bat, and a spot of blood on a door in the defendant's apartment, but the blood was not linked to the complainant.  Id. at 293-94.  The police were able to swab the spot only after the defendant initially refused their request to do so and after he tried, unsuccessfully, to wipe it clean.  Id.

The First Circuit, analyzing this evidence, concluded that there was only "reasonable speculation" that the defendant committed the assault.  Id. at 302.  That there was no forced entry was not particularly probative given the possibility that she could have allowed her assailant to enter the apartment.  The fact that nothing was taken belied the defendant's profit motive for the crime, and was not adequately explained by the audibility of the 911 call.  And the "consciousness of guilt" evidence concerning the

defendant's demeanor when the police arrived, and his initial failure to consent to a search, was weak at best, and was explained by his drug use and fear of what the police might find in his apartment.  Finding that the evidence against the defendant was insufficient, and that the state court decision to the contrary was "objectively unreasonable," the First Circuit directed that the habeas corpus petition be granted.  Id. at 306.

The O'Laughlin court pointed to two other decisions in which habeas corpus relief was granted on insufficiency of the evidence grounds as support for its conclusion.  In Newman v. Metrish, 543 F.3d 793 (6th Cir. 2008), the Sixth Circuit held that a state court ruling that there was sufficient evidence of guilt was objectively unreasonable under circumstances similar to O'Laughlin.  In Newman, there was evidence that the defendant wanted to rob drug dealers, that the homicide victim was a drug dealer, that his drugs had been stolen, that someone had seen the defendant in possession of a gun similar to that used to kill the victim, and circumstantial evidence that the defendant had purchased the gun used in the killing.  Id. at 797.  The Sixth Circuit held that even if was assumed that the defendant had owned the murder weapon, there was no evidence as to where the weapon was between the time it was previously seen and the day of the murder.  Id. "Without additional evidence placing [the defendant] at the scene of the crime, there is only a reasonable speculation that [he] himself was present."  Id.

35

The O'Laughlin court also relied on the Ninth Circuit's decision in Juan H. v. Allen, 408 F.3d 1262, 1279 (9th Cir. 2005), holding that evidence of the defendant's flight and lies to the police, and of "interpersonal tensions" between the defendant and the victim, was insufficient, and that only speculation supported a conclusion of guilt. The Juan H. court specifically noted that "[a]lthough we must draw all reasonable inferences in favor of the prosecution, a 'reasonable' inference is one that is supported by a chain of logic, rather than, as in this case, mere speculation dressed up in the guise of evidence." Id. at 1279.

In this case, as in those noted above, Mr. Valenko's lies about his injuries and the whereabouts of Ms. Jakovleva, his departure from the country after his roommates' disappearance, and his injuries shortly afterward established no more that a "reasonable speculation" of his involvement in the murders. There was no evidence as to where the deceased were killed or that Mr. Valenko was present, and nothing else linked Mr. Valenko to the murders. Only by leaping gaps in the chain of logic necessary to establish his involvement could the state courts have reached the conclusion that there was sufficient evidence of his guilt.

In sum, the circumstantial evidence was legally insufficient to sustain appellant's conviction of murder in the first degree or any of the other charged offenses. The Appellate Division's determination to the contrary was an unreasonable application of clearly established federal law under Jackson, 443 U.S. at 316, and In re Winship, 397 U.S.

36

at 364.  Accordingly, this Court should grant Mr. Valenko's petition and order that he be released from his unconstitutional confinement.

POINT II

THE TRIAL COURT VIOLATED PETITIONER'S DUE PROCESS RIGHT TO A FAIR TRIAL BY ERRONEOUSLY GIVING AN ACTING IN CONCERT INSTRUCTION WHEN THERE WAS NO EVIDENCE WHATSOEVER THAT APPELLANT ACTED IN CONCERT WITH ANYONE TO DO ANYTHING.

There was no evidence that Vladimir Balachov had anything to do with whatever struggle had left Mr. Valenko shaken, and with scratches, when he went to his landlady's apartment shortly after the disappearance of his roommates.  Nor was there any evidence before the jury that Mr. Valenko had anything to do with disposing of the bodies of Ms. Jakovleva and Mr. Askerov.  Nevertheless, before a single witness testified, the court, ostensibly to clarify that "it's really not a defense to any crime to say, 'I did it with someone else, therefore I am not guilty,'" expressed its intention to give an acting in concert instruction to the jury (VD. 33).  Although counsel had specifically disavowed any intent to make that illogical argument, and there was no evidence to support an acting in concert charge, the court insisted, over defense counsel's objection, on giving the charge.  As this improperly given charge relieved the prosecution of its obligation to prove that Mr. Valenko killed his roommates, and may have been an improper basis for Mr. Valenko's conviction, it violated his due process right to a fair trial, and his petition

must be granted.  U.S. Const., Amend. XIV; N.Y. Const. Art. 1, § 6; <u>Sandstrom</u> v. <u>Montana</u>, 442 U.S. 510 (1979).

It is well-established that a state violates the Due Process clause of the Fourteenth Amendment if it convicts a defendant of a crime on less than proof beyond a reasonable doubt.  <u>Jackson</u> v. <u>Virginia</u>, 443 U.S. 307, 316 (1979);  <u>In re Winship</u>, 397 U.S. 358, 364 (1970).  In turn, the Supreme Court has clearly established that a jury instruction violates Due Process if it "had the effect of relieving the State of the burden of proof enunciated in <u>Winship</u>."  <u>Sandstrom</u> 442 U.S. at 521.  The question a reviewing court must answer is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process."  <u>Cupp</u> v. <u>Naughten</u>, 414 U.S. 141, 147 (1973); <u>see</u> <u>Henderson</u> v. <u>Kibbe</u>, 431 U.S. 145 (1977).  The acting in concert instruction in this case was given not because there was evidentiary foundation for it, but as a pre-emptive strike by the court against defense use of a ludicrous argument counsel specifically disavowed.  Because that instruction enabled the jury to connect Balachov's disposal of the bodies with circumstantial evidence that did not connect Mr. Valenko to the murders in any other way, that instruction violated due process.  <u>See</u> <u>Murray</u> v. <u>Diguglielmo</u>, 591 Fed. Appx. 142, 147 (3d Cir. 2014) ("a determination of whether there was a reasonable likelihood that the jury would apply the instruction so as to relieve the Commonwealth of its burden of proving an essential element of the crime presents a federal due process question") (unpublished opinion); <u>Stone</u> v. <u>Wingo</u>, 416 F.2d 857, 866-67 (6th Cir. 1969)

38

(considering, but rejecting on the merits, a claim that jury instruction on accomplice liability was not based on sufficient evidentiary foundation).[5]

In this case, the evidence about what happened the night Mr. Askerov and Ms. Jakovleva disappeared involved Mr. Valenko alone.  He neither did nor said anything indicating he had participated with anyone else in any conduct whatsoever, much less the murders themselves.  Similarly, Balachov dumped the torsos in New Jersey alone.  There was no evidence connecting Mr. Valenko to that act.  The danger of the acting in concert instruction was that the jury might use it to conclude that since there was evidence from which it could be inferred that Mr. Valenko knew about the murders, and his roommate disposed of the bodies, those two men must have acted in concert to commit the murders.  But there was no proof of any such joint activity with respect to the murders on which such a conclusion could be based.

The only piece of evidence from which acting in concert could be gleaned was the hardware store manager's testimony that two Russian men bought a circular saw with Mr. Askerov's credit card.  That evidence does not support giving the charge in Mr. Valenko's first-degree murder trial for two reasons.   First, the manager neither identified Mr. Valenko at trial, nor gave a description that matched him.  Second, even if he had, the most this could have established was acting in concert with respect to the

---

[5]     Because Mr. Valenko does not claim that the instruction the court was flawed, the Supreme Court's decision in Waddington v. Sarausad, 555 U.S. 179 (2009), discussing ambiguities in jury selection, and finding that clarity of instruction forecloses habeas corpus relief, is inapposite to his claim in this case that the acting in concert instruction, correct or not, should not have been given at all.

dismemberment of the bodies.  It could not support the charge with respect to the murders.  The law in New York is that a defendant's participation in disposing of the body after a murder, even when there is proof that the defendent was present at the scene of the murder, is insufficient to prove the defendant's involvement in the murder.  People v. LaBelle, 18 N.Y.2d 405, 411-12 (1966); see Point I at 25-26, ante.  Here, of course, there was no proof that Mr. Valenko was anywhere near the scene of the murders when they occurred.

Nor was an acting in concert instruction necessary.  The court's stated concern that the jury might not understand that it is no defense to say "I did it with someone, therefore I'm not guilty," is absurd on its face.  There was no reason to believe that the jury would have any such illogical misunderstanding and defense counsel specifically disavowed any intent to make that argument.  In fact, the court's concern is so obviously without merit as to call into question its motive in reaching out to give such an instruction in a case involving such little evidence of guilt.

The State's entire argument on direct appeal concerning the acting in concert evidence was set forth in one paragraph at pages 44 to 45 of their brief (Exhibit C).  It asserted that the instruction was warranted solely because there was evidence that Balachov dumped the bodies and that two people who looked similar to Mr. Valenko and Balachov bought a circular saw shortly after Ms. Jakovleva and Mr. Askerov were last seen.  Since the circular saw was not the murder weapon and was used only to dismember

the bodies, all of the supposed acting-in-concert evidence relates <u>only</u> to the dismemberment.  None of it relates to the murders themselves.

The Ninth Circuit's habeas corpus decision <u>Quigg</u> v. <u>Crist</u>, 616 F.2d 1107 (9th Cir. 1980), is instructive.  In that case, "the state's predominant theory" was that Quigg, acting alone, had robbed and murdered a man named Lee Robbins and drove his car away before abandoning it.  <u>Id</u>. at 1111.  Quigg claimed on appeal that by giving the jury an aiding and abetting instruction, the trial court had violated his due process rights.  The Ninth Circuit stated the test to be applied as follows:

> the giving of an aiding and abetting instruction does not violate due process where the state has abolished the distinction between principals and accessories, and where there is evidence in the record before the jury to support the instruction.

<u>Id</u>. (citing <u>Carothers</u> v. <u>Rhay</u>, 594 F.2d 225, 229 (9th Cir. 1979)).  The Court then held that there was no violation of due process because there had been evidence that Robbins was followed by two men shortly before his death, that two men had been seen driving a car away from the scene, that a fingerprint matching neither Quigg nor Robbins was lifted from Robbins's car, and that Quigg was overheard talking with a friend shortly after the murder about "getting rid of something."  <u>Id</u>. at 1112.  While this evidence was not strong, the Court of Appeals cited it as a basis for deciding that the giving of the aiding and abetting instruction did not violate Quigg's due process rights.

The factual difference between this case and <u>Quigg</u> is immediately apparent.  The evidence the <u>Quigg</u> Court cited involved two men acting together, whereas here, there was no such evidence at all.  No one testified that they saw Mr. Valenko and Balachov together, or speaking to one another, at any point in time relating to either the murders or the disposal of the torsos.  The only testimony about two men acting together had to do with the Russians who bought the circular saw which, presumably, was done with the intent to dismember the bodies.  But there was no evidence that two men acted together to carry out the dismemberment, much less that those men were Mr. Valenko and Balachov, or that buying the circular saw had anything to do with the murders.

In sum, there was no evidence that Mr. Valenko acted in concert with anyone in whatever fight occurred the night of the disappearances and there was no evidence he had anything to do with the disposal of the bodies or the purchase of the circular saw that was probably used to dismember them.  Since the acting in concert instruction the court gave over defense objection could have been used by the jury to improperly leap over gaps in the evidence by attributing to Mr. Valenko participation that was not proven, relieving the State of the obligation to prove Mr. Valenko's guilt with respect to the murders, the erroneously given charge violated his due process right to a fair trial.

**B.**   **PETITIONER'S ENTITLEMENT TO A WRIT OF HABEAS CORPUS**

1.   Exhaustion

Both of Petitioner's constitutional Due Process claims were fully exhausted in the state courts.   Defense counsel at trial specifically argued that there was insufficient evidence of petitioner's guilt both on intent and because there was "no nexus between the defendant and the actors," either as the perpetrator or as an accomplice (458).   Citing the Fourteenth Amendment of the United States Constitution and Jackson v. Virginia 443 U.S. 307 (1979), petitioner raised the same claim in the Appellate Division (Exhibit B at 25), and that court rejected that argument on the merits (Exhibit A).

Defense counsel also specifically objected to the trial court's giving an acting in concert instruction on the ground that there was no evidence of interaction between petitioner and Balachov upon which such an instruction could be based (458, 459). Again, petitioner, citing the Due Process clause of the Fourteenth Amendment, raised the same claim in the Appellate Division (Exhibit B at 34), and the Appellate Division rejected the argument on the merits.

In his application for leave to appeal to the Court of Appeals, petitioner sought review of the "question of state and federal constitutional law in the above-captioned case, as stated in his briefs in the Appellate Division, which ought to be reviewed by the Court of Appeals" (Exhibit E, Letter of April 22, 2015).   He then discussed both of the

43

issues raised in this petition at length in his May 21, 2015, follow-up letter to Judge Read, who denied the application on June 16, 2015 (Exhibit E).

2.      Timeliness

Since the petition has been filed within 1 year and 90 days of the date his state appeal became final when leave to appeal to the Court of Appeals was denied on June 16, 2015, it is timely (see Exhibit E).  Jiminez v. Quarterman, 555 U.S. 113 (2009); Ross v. Artuz, 150 F.3d 97, 98 (2d Cir. 1998).

3.      AEDPA Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") provides that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

"A state-court decision is 'contrary' to established federal law withing the meaning of § 2254(d)(1) if it is 'diametrically different' from, 'opposite in character or nature' to, or 'mutually opposed' to the relevant Supreme Court precedent.  Henry v. Poole, 409 F.3d 48, 68 (2d Cir. 2005) (quoting Williams, v. Taylor, 529 U.S. 362, 405 (2000)).  Since the facts in Mr. Valenko's case are not materially indistinguishable from any particular

44

Supreme Court case, and because the state court determination that the State's rulings on sufficiency of the evidence and propriety of the acting in concert instruction were not opposite to Supreme Court precedent, Mr. Valenko does not claim it was contrary to clearly established federal law.

Rather, he claims that the state court's decision was an "unreasonable application" of clearly established law as determined by the Supreme Court in Jackson v. Virginia, 443 U.S. 307 (1979), and Cupp v. Naughten, 414 U.S. 141 (1973). A state court makes an unreasonable application of federal law when it "'correctly identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case,' or refuses to extend a legal principle that the Supreme Court has clearly established to a new situation in which it should govern." Hoi Man Yung v. Walker, 468 F.3d 169, 176 (2d Cir. 2006) (quoting Williams, 529 U.S. at 413). The issue is not whether all reasonable jurists would agree that there was error, but rather that there was "some increment of incorrectness beyond" mere error, Howard v. Walker, 406 F.3d 114, 122 (2d Cir. 2005) (quoting Williams, 529 U.S. at 411), which "need not be great." Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000); see Jimenez, 458 F.3d at 147. "[A] state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington v. Richter, 131 S.Ct. 770, 786–787 (2011).

45

This Court has the power to issue a writ of habeas corpus on both of petitioner's due process claims in this case.  As was discussed in Points I and II above, the state court rulings were unreasonable because the lack of proof that petitioner was involved in the murders of Ms. Jakovleva and Mr. Askerov, and that there was no evidentiary basis for the giving of an acting in concert instruction, were both so obvious that there is no possibility for fairminded disagreement and the resulting prejudice was extreme. Accordingly, the state court rulings in this case constituted an unreasonable application of Supreme Court precedent clearly establishing a defendant's constitutional Due Process rights to be convicted only upon proof beyond a reasonable doubt and to a fair trial.

## C.    RELIEF REQUESTED

Petitioner requests that this Court:

(1)    Issue a writ of habeas corpus;

(2)    Order respondent to discharge petitioner from his unconstitutional confinement or, in the alternative,  if the court finds that there was sufficient evidence of guilt but a constitutional due process violation with respect to the jury instruction, petitioner should be released unless the State affords him a new trial within a reasonable time and,

46

(3)     Grant petitioner such other and further relief as may be just and proper.

Respectfully submitted,

LYNN W. L. FAHEY (LF 1652)
Attorney for Petitioner

_____
By: PAUL SKIP LAISURE (PL 5560)
APPELLATE ADVOCATES
111 John Street, 9th Floor
New York, New York 10038
(212) 693-0085, ext. 211

September 13, 2016