UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ANATOLY VALENKO,

                Petitioner,

     *v.*

DALE ARTUS, Superintendent of Attica
Correctional Facility,

                Respondent.

**REPORT &
RECOMMENDATION**
16-CV-5089-MKB-SJB

**BULSARA, United States Magistrate Judge:**

On September 13, 2016, Anatoly Valenko ("Valenko"), serving a life sentence for first-degree murder, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Pet. for a Writ of Habeas Corpus by a Person in State Custody dated Sept. 13, 2016, ("Pet."), Dkt. No. 1). In his petition, Valenko makes two arguments. First, he alleges that the evidence presented to the jury was insufficient for any reasonable jury to find him guilty beyond a reasonable doubt. (*Id.* at 21–37). And second, he alleges that the state court erroneously instructed the jury on acting-in-concert liability. (*Id.* at 37–45). For the reasons detailed below, the Court respectfully recommends that Valenko's petition be denied and no certificate of appealability be issued.

<u>FACTS AND PROCEDURAL HISTORY</u>

In 2011, Valenko was convicted of first-degree murder of Larisa Jakovleva ("Jakovleva") and Fakhat Askerov ("Askerov") after a jury trial in New York State Supreme Court, Kings County. (Tr. of Trial of Anatoly Valenko ("Trial Tr."), attached as Ex. A to Resp't's Resp. to Order to Show Cause ("Opp'n"), Dkt. No. 6, at 624:13–625:02). Justice Joel Goldberg presided over the trial. (*See id.*).

Jakovleva and Askerov (Jakovleva's boyfriend) lived together at 1800 East 12th Street, Apartment 2H, in Brooklyn, New York, with two roommates: Valenko and Vladimir Balachov ("Balachov"). (*Id.* at 45:06–:10, 46:18–:25, 47:20–48:05, 318:23–319:17).

Ludmila Iodko ("Iodko") and Jakovleva were friends. (*Id.* at 44:02–45:05, 448:21–:25). Iodko testified that, on November 12, 1995, she met up with Jakovleva and Askerov and drove with them on their errands.[1] (*Id.* at 48:07–50:02). When all three returned to Brooklyn, Askerov parked his car in the building garage. (*Id.* at 52:11–:17). Iodko and Jakovleva then went grocery shopping. (*Id.* at 51:02–:04). The three of them had dinner together and visited other friends in the neighborhood, with Iodko returning home around 10 PM. (*Id.* at 51:15–52:08). Jakovleva asked Iodko to call her the next day. (*Id.* at 53:07–:11). The next morning, Iodko tried to reach her multiple times. (*Id.* at 53:12–:20). When no one answered, she testified: "I got very nervous and been calling very often, very frequently. At least once an hour, I think maybe even more." (*Id.* at 53:21–:25).

Eventually, later that day, Valenko answered the phone and "said that [Jakovleva and Askerov] had some relatives over on Sunday over and they left to another state." (*Id.* at 54:13–:15). Iodko asked Valenko to call her if Jakovleva and Askerov returned, and she left her phone number. (*Id.* at 55:12–:14).

A few days later, Valenko called Iodko. (*Id.* at 55:19–56:03). He told her that Jakovleva and Askerov had left town, and he requested help in paying the rent they owed. (*Id.*). He offered his video camera as security in exchange for the rent; Iodko

---

[1] Iodko knew Askerov as "Oscar." (*Id.* at 45:24–46:09).

agreed, and they met the next day in Manhattan. (*Id*. at 56:05–:09). Iodko testified that when they met, he had multiple, parallel scratches across his face and black bruises, (*id*. at 56:17–57:15), which he explained were injuries from a kickboxing class, (*id*. at 57:16–:21). They made the exchange and parted ways. (*Id*. at 57:22–58:04). Iodko continued to call the apartment over the next few days, (*id*. at 58:05–:10), but was unable to reach either Jakovleva or Askerov.

After a few days, Iodko went to Brooklyn to investigate. (*Id*. at 58:22–:23). She did so

> [b]ecause nothing was fitting together and I really wanted to be sure if they left another state they would leave probably by car and car wouldn't be there. So I went to check on car and car was in the same spot and I knew how I left the car because I left my soda there, raincoat was there and the way I had snack wrappers. Always the same way I left it.

(*Id*. at 59:03–:08). After a few weeks, in early 1996, she called the police. (*Id*. at 61:07–62:04).

Alla Prevorukhova ("Prevorukhova") was the landlord for Apartment 2H. (*Id*. at 318:23–319:17). When Valenko moved in, the apartment was furnished. (*Id*. at 319:25–320:05). Prevorukhova testified that she had keys to the apartment and that she visited the apartment once every week or every ten days to pick up her mail. (*Id*. at 320:16–321:05). On November 12, 1995, Valenko called her to ask for a set of keys to the apartment. (*Id*. at 324:24–325:06). He arrived at her apartment late that night, saying that he had been assaulted by two black men who also stole his wallet and keys. (*Id*. at 324:09–:20, 326:17–:25). Prevorukhova testified that Valenko's hands were scratched and that "[h]e looked pretty nervous, his hands were shaking, his face was really scratched—well, he used to have earring in his ear, there was no earring and it was bloody." (*Id*. at 325:20–:25). He told her "he punched the guy who assaulted him" and

might have killed him.  (*Id.* at 326:05–:09).  She also testified that Valenko "told [her] that something wrong happened with [Askerov]."  (*Id.* at 328:02–:03).  At the trial, Prevorukhova could not identify Valenko.  (*Id.* at 333:17–:23).

On November 18, 1995, a few days later, Prevorukhova went to the apartment and noticed that it was "unusually clean"; the carpet was gone; and towels, bedspreads, and sheets were missing.  (*Id.* at 330:14–331:16).

Mitchell Weingand ("Weingand") was an employee at a hardware store on Brighton Beach Avenue from 1980 to 1995.  (*Id.* at 73:07–:16).  He testified that on November 13, 1995, he sold a Skill 1500 circular saw to two men.  (*Id.* at 74:09–:12, 75:06–:13).  One was "slight" with "greasy looking" "sandy blonde hair."  (*Id.* at 75:06–:11).  The other was "more stocky," but they were the same height and "similar looking."  (*Id.* at 75:08–:13).  Both had Russian accents.  (*Id.* at 79:02–:04).  The sandy-haired man used a credit card belonging to Askerov to pay for the items.  (*Id.* at 76:02–78:21, 79:23–80:04).  The description of "sandy blonde hair" was consistent with Valenko's appearance at the time.  (*See id.* at 322:23–323:13; *see also* Opp'n at 8–9).

Timmy Hall testified that he was working at a gas station in Milburn, New Jersey, on November 14, 1995.  (Trial Tr. at 243:10–:22).  After work, he walked to the bus station via a trail in South Mountain Reservation, a park in South Orange, New Jersey.  (*Id.* at 244:16–245:06).  On his walk, he saw a thin white man with a goatee unload two suitcases from his truck and leave them in the park.  (*Id.* at 245:07–247:16).  The man appeared to struggle with the suitcases, as if they were heavy.  (*Id.* at 249:09–250:14).  Hall later identified Balachov from a photo array as the man with the suitcases.  (*Id.* at 135:04–137:01, 256:18–258:05).  Iodko subsequently identified one of the suitcases as

4

belonging to Jakovleva.  (*See id.* at 60:19–61:05; Aff. in Opp'n to Pet. dated Jan. 9, 2017, Dkt. No. 6, ¶ 28).

After Balachov drove away, Hall went over to the suitcases; he testified that its contents "felt like a human flesh, . . . like a human body."  (Trial Tr. at 252:01–:08).  He then called his friend Karen Frohbose ("Frohbose") for help, and she opened up the suitcases, which contained two torsos.  (*Id.* at 252:09–253:02).[2]

Frohbose confirmed Hall's account: "[Hall] saw something in the reservation that he thought I should see."  (*Id.* at 21:25–22:01).  She met him, drove to the park, and found two dismembered bodies in suitcases.  (*Id.* at 22:15–23:15).  Michael Prokopiw ("Prokopiw"), then a detective with the Essex County Police Department, testified that he responded to the scene and was assigned to investigate the two deaths.  (*Id.* at 122:19–:25, 123:17–:21, 127:9–:11).

On November 16, 1995, Anna Ladishenskaya was walking her dogs on Plum Beach in Brooklyn.  (*Id.* at 92:07–93:13).  She saw a woman's leg and foot floating in the water, and she called the police.  (*Id.* at 93:04–95:10).  Four of the NYPD officers who responded to Plum Beach, Arthur Semioli ("Semioli"), Robert Sommer ("Sommer"), William Menendez ("Menendez"), and James McCafferty ("McCafferty"), testified at Valenko's trial.  (*Id.* at 100:05–:11, 149:22–150:25, 166:25–167:06, 167:20–168:05, 176:03–:08).  After initial cooperation with law enforcement in Essex County, the NYPD eventually took over the investigation.  (*Id.* at 135:01–:02).

---

[2] On cross-examination, Hall testified that he initially gave the police a pseudonym and incorrect contact information because he "[was] a black male in a predominant white neighborhood" and he was afraid he would be blamed for the murders.  (*Id.* at 267:17–268:05).

Semioli was a homicide detective in Brooklyn in 1995. (*Id.* at 97:12–99:11). When he responded to Plum Beach, he found a male human head in addition to the female leg and foot. (*Id.* at 100:08–:14). He testified that he took the head to the Essex County Medical Examiner's Office in New Jersey and that it matched with the torso found in the suitcases at the South Mountain Reservation. (*Id.* at 104:02–:21).[3] Prokopiw, who was also present, testified that "[e]verything was a very good match." (*Id.* at 129:17–:25). Using dental records, a forensic dentist later identified the male body as Askerov's. (*Id.* at 132:04–133:10, 230:21–231:06). The forensic pathologist, Carlos Fonseca ("Fonseca"), who conducted Askerov's autopsy testified that there were numerous stab wounds on his body and that the dismemberment occurred postmortem. (*Id.* at 385:23–392:08). The dismemberment was consistent with a circular saw. (*Id.* at 393:18–:25).

Fonseca was also present during the autopsy of the female body.[4] (*Id.* at 401:03–:06). The body had stab wounds and showed signs of postmortem dismemberment. (*Id.* at 402:07–404:15). His opinion was that she died of "[m]ultiple stab wounds to the neck." (*Id.* at 416:12–:24). Iodko said Jakovleva had a birthmark on her upper back,

---

[3] Menendez, then a member of the NYPD Crime Scene Unit, testified that he and his partner also responded to Plum Beach on November 17, 1995. (*Id.* at 166:25–167:07, 167:20–168:05). He photographed the body parts discovered on the beach, (*id.* at 170:21–171:04), as well as the crime scene, (*id.* at 170:9–:12). He observed, and photographed, facial wounds on the male head. (*Id.* at 171:07–:12). The body parts were then brought to the Kings County Medical Examiner's Office. (*Id.* at 173:21–:23). His photographs were introduced at trial.

[4] The doctor who conducted the autopsy on the female body had a stroke and was unavailable for trial. (*Id.* at 400:16–401:02).

(*id.* at 449:01–:07), and looking at a photograph of the dismembered female body, Iodko said the birthmark belonged to Jakovleva, (*id.* at 449:08–450:11).[5]

On February 26, 1996, Semioli and McCafferty, partners at the time, visited Apartment 2H.  (*Id.* at 105:12–:22, 180:06–:20).  Semioli observed that there were no rugs in the apartment, (*id.* at 107:01–:12), and McCafferty noted there were "remnants of carpet" on the walls, which indicated to him a carpet had been removed, (*id.* at 181:13–:19).  Semioli also observed stains on the couch and bed.  (*Id.* at 107:23–108:01).  The prosecution introduced a sketch of the apartment at the time into evidence, as well as photographs taken at the scene.  (*Id.* at 109:9–:17, 181:24–182:16, 184:15–:20).  The detectives vouchered pieces of rug, stained bed linens, the stained couch cushion cover, and a metal door strip for forensic analysis.  (*Id.* at 107:25–108:01, 192:18–193:16).  They did not dust for fingerprints.  (*Id.* at 206:16–:22).

A forensic team also performed a luminol test in the apartment.  (*Id.* at 108:02–:09, 187:23–188:13).  To conduct the test, the technicians sprayed luminol on the wall and the substance turned blue, which Semioli testified was "consistent with blood being present."  (*Id.* at 108:12–:18).  Both detectives and an expert witness in forensic science, Asako Ishii ("Ishii"), also testified that luminol reacts with human saliva and other bodily fluids, animal liquids, and potentially other chemicals, (*id.* at 115:10–116:04, 204:09–205:18, 275:11–:20, 292:15–293:24).

Ishii testified about the analysis performed on the door saddle, pieces of rug, bedspread, and couch cushion cover.  (*Id.* at 278:24–279:03).  She testified that, within

---

[5] Prokopiw testified that Jakovleva was identified through her IUD, (*id.* at 133:11–:18, 142:17–:22, 143:07–:22), but Justice Goldberg instructed the jury to disregard this testimony, (*id.* at 596:15–:20 ("Do not speculate about who the IUD belonged to.")).

a reasonable degree of scientific certainty, there was blood on the door strip, rug fragments, and couch cover, and that the DNA profile matched the male body parts recovered at Plum Beach and in South Mountain Reservation. (*Id*. at 281:23–284:07). She also testified that a woman's blood was identified on the bedspread, but it was not matched to the recovered female body parts. (*Id*. at 285:14–287:12).

As the investigation progressed, the detectives attempted to locate Valenko, who had left Brooklyn in November 1995. Valenko had reported his passport stolen to the Ukrainian consulate in May 1995, (*id*. at 209:01–:09), and he was issued a one-time certificate of return to Ukraine that was valid for one month, starting on November 13, 1995, (*id*. at 209:10–:19). In May 1997, Valenko was confirmed to be in Kiev, Ukraine. (*Id*. at 196:24–197:09). In February 2007, Interpol notified McCafferty that Valenko was in the Netherlands. (*Id*. at 199:20–:23). Valenko was extradited to the United States in November 2008, accompanied by Sommer and McCafferty. (*Id*. at 157:15–:25, 201:03–:11).

A trial was held on October 18, 19, 20, and 26, 2011. (*See generally id*.). Balachov, who remains a fugitive, (Pet. at 3), was not present, and Valenko was tried alone.

After two days of deliberations, the jury unanimously convicted Valenko of first-degree murder. (Trial Tr. at 624:13–:20). Valenko moved to set aside the verdict, arguing that the jury was improperly charged on acting-in-concert liability and there was insufficient evidence to convict him. (Sentencing Tr. dated Dec. 13, 2011 ("Sentencing Tr."), attached as Ex. A, pt. 4, to Opp'n, Dkt. No. 6, at 2:11–3:05). The motion was denied. (*Id*. at 4:02–:03). Valenko was sentenced to life in prison without parole. (*Id*. at 13:01–:07).

Valenko appealed his conviction to the Appellate Division, Second Department. *People v. Valenko*, 126 A.D.3d 1020, 1020 (2d Dep't 2015). He argued, among other things, that the evidence was insufficient to sustain a conviction and that the acting-in-concert instruction was improper. *Id.* The Appellate Division upheld the verdict and found that, "[w]hile the People's case was based entirely on circumstantial evidence, . . . it was legally sufficient to establish the defendant's guilt beyond a reasonable doubt." *Id.* It also ruled that Justice Goldberg "properly instructed the jury on accomplice liability." *Id.* Valenko sought leave to appeal from the New York Court of Appeals, which was denied on June 16, 2015. *People v. Valenko*, 25 N.Y.3d 1172 (2015). On September 13, 2016, Valenko filed a petition for a writ of habeas corpus in the Eastern District of New York. (Pet.). On July 8, 2020, the Honorable Margo K. Brodie referred the petition to the undersigned for a Report and Recommendation. (Order Referring Case dated July 8, 2020). For the reasons stated below, the Court recommends that the petition be denied.

<u>DISCUSSION</u>

Valenko seeks habeas corpus relief pursuant to 28 U.S.C. § 2254(d)(1). (*See* Pet. at 22–23). Under § 2254(d)(1), a petition for a writ of habeas corpus by someone in state custody following a state court adjudication on the merits "shall not be granted . . . unless the adjudication of the claim . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined

by the Supreme Court of the United States."[6]  *See also Shoop v. Hill*, 139 S. Ct. 504, 506 (2019) (per curiam) ("[H]abeas relief may be granted only if the state court's adjudication 'resulted in a decision that was contrary to, or involved an unreasonable application of,' Supreme Court precedent that was 'clearly established' at the time of the adjudication." (quoting 28 U.S.C. § 2254(d)(1))).

"This means that a state court's ruling must be 'so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'"  *Id.* (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).  A decision is "contrary to . . . clearly established Federal law" when "the state court arrives at a conclusion opposite" to a conclusion reached by the U.S. Supreme Court on a question of law or "a set of materially indistinguishable facts," or if the state court identifies the correct governing legal rule but unreasonably applies it to the facts of the petitioner's case.  *Williams v. Taylor*, 529 U.S. 362, 413 (2000). "[C]learly established Federal law" is limited to rules established by the Supreme Court "existing at the time the defendant's conviction became final."  *Id.* at 381 (quoting *Teague v. Lane*, 489 U.S. 288, 301 (1989)).

---

[6] The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254, authorizes federal courts to provide habeas corpus relief to people in state custody.  *See* 28 U.S.C. § 2254(a).  AEDPA requires that a petitioner must first exhaust all available remedies in state court.  *Id.* § 2254(b)(1)(A).  For a claim to be exhausted, a petitioner must "fairly present" his claims to the state courts.  *Vega v. Griffin*, No. 14-CV-7479, 2020 WL 2738229, at *7 (E.D.N.Y. Apr. 13, 2020), *report and recommendation adopted*, Order (May 20, 2020).  Any federal court habeas petition must also be timely, that is, filed within one year of the state-court judgment becoming final.  28 U.S.C. § 2244(d)(1).  Respondent does not dispute that Valenko has satisfied each of these statutory requirements, and the Court's independent review of the record confirms they have been met.

A decision "involve[s] an 'unreasonable application'" of clearly established federal law when it "unreasonably applies" a rule established by the Supreme Court to a petitioner's case. *Id.* at 407. The "unreasonable application" standard "is difficult to meet," and relief is limited to "cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents." *Harrington*, 562 U.S. at 102. That is, "[a]s a condition for obtaining habeas corpus from a federal court," a person in state custody must establish "that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103.

Valenko argues that two aspects of his trial "involved an unreasonable application of . . . clearly established Federal law." First, he argues that his conviction was based on insufficient evidence. Second, he argues that the giving of the acting-in-concert instruction to the jury was improper.

I.   A Reasonable Jury Could Have Found Valenko Guilty Beyond a Reasonable Doubt Based on the Evidence Introduced at Trial

Valenko argues that his conviction, based on the evidence presented at trial, involved an unreasonable application of clearly established federal law. This claim was fairly presented to the state court and is appropriately considered on habeas review. (Sentencing Tr. at 2:11–3:03); *Valenko*, 126 A.D.3d at 1020; *see Vega*, 2020 WL 2738229, at *7.

> In cases challenging the sufficiency of the evidence supporting a state-court criminal conviction, our concern is not with the state courts' application of the state law defining the offense, but rather with the state courts' application of federal law, and, in particular, the sufficiency standard set forth by the Supreme Court in *Jackson v. Virginia*[.]

*Epps v. Poole*, 687 F.3d 46, 50 (2d Cir. 2012).

Under *Jackson*, "a state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient . . . has stated a federal constitutional claim." *Jackson v. Virginia*, 443 U.S. 307, 321 (1979) (citing *In re Winship*, 397 U.S. 358, 364 (1970)).  However, because this Court's review of such a claim arises on habeas review, the Court must determine whether "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Id.* at 319. To do so, the Court applies a "doubly deferential standard of review."  *Epps*, 687 F.3d at 50 (quoting *Garbutt v. Conway*, 668 F.3d 79, 81 (2d Cir. 2012) (per curiam)).  The Court "defer[s] first to the jury's verdict, drawing all inferences in its favor," and second "to the state courts' rejection of the defendant's constitutional arguments, at least insofar as it did not result from an unreasonable determination of the facts or an unreasonable application of clearly established federal law."  *Id.*; *see, e.g.*, *Rivera v. Cuomo*, 664 F.3d 20, 21–22 (2d Cir. 2011) (per curiam) ("[W]e find that although evidence of 'significantly heightened recklessness' was slim, at best, giving the state courts and the jury the utmost deference, we cannot find that the evidence was *so* completely lacking that *no* rational jury could have found Rivera guilty of depraved indifference murder." (quoting *People v. Sanchez*, 98 N.Y.2d 373, 380 (2002))).

The Court finds that, when viewed under this deferential standard, a rational jury could have convicted Valenko based on the evidence presented at trial.

Justice Goldberg instructed the jury on five elements of first-degree murder:

the People are required to prove from all of the evidence in the case, beyond a reasonable doubt, each of the following five elements: (1) That on or about November 12th, 1995, in the County of Kings, the defendant, either

> personally or acting in concert with another person or persons, caused the deaths of Fakhat Askerov and Larisa Jakovleva by stabbing them; (2) that the defendant did so with the intent to cause the death of Fakhat Askerov and the intent to either cause the death or serious physical injury to Larisa Jakovleva; and (3) that the defendant caused both deaths during the same criminal transaction; and (4) that neither victim was a participant in the criminal transaction; and (5) that the defendant was more than 18 years old at the time of the commission of the crime.

(Trial Tr. at 564:14–565:04); *accord* N.Y. Penal Law § 125.27(1) ("A person is guilty of murder in the first degree when . . . [w]ith intent to cause the death of another person, he causes the death of such person or of a third person; and . . . as part of the same criminal transaction, the defendant, with intent to cause serious physical injury to or the death of an additional person or persons, causes the death of an additional person or persons; provided, however, the victim is not a participant in the criminal transaction; . . . and [t]he defendant was more than eighteen years old at the time of the commission of the crime.").

Based on the evidence presented, a reasonable jury could have found Valenko guilty of each of these elements beyond a reasonable doubt. Valenko disputes the validity of the acting-in-concert instruction in the first element—an issue the Court addresses below. Otherwise, he generally argues that the evidence at trial was only circumstantial and insufficient for a jury to find him guilty of first-degree murder. Specifically, he contends that "[t]he State presented no evidence, direct or circumstantial, linking [him] to the murder of his roommates." (Pet. at 25). Valenko asserts that the case is "wholly circumstantial" and that a reasonable jury could have found him guilty "[o]nly by leaping gaps in the chain of logic." (*Id.* at 32, 36)

As a preliminary matter, that the evidence was "wholly circumstantial" does not render it insufficient. Indeed, "[c]ircumstantial evidence is as persuasive as direct

evidence." *Mallette v. Scully*, 752 F.2d 26, 32 (2d Cir. 1984); s*ee, e.g.*, *Augugliaro v. Bradt*, No. 08-CV-1548, 2014 WL 5093849, at *6 n.5 (E.D.N.Y. Oct. 8, 2014) ("To the extent that petitioner also bases his challenge to the sufficiency of the evidence on the alleged lack of physical evidence connecting him to the murder, this argument is meritless.  A conviction 'may be proven entirely by circumstantial evidence.'" (quoting *United States v. Sureff*, 15 F.3d 225, 228 (2d Cir. 1994))).  And here, a rational jury could have concluded, beyond a reasonable doubt, that Valenko murdered Jakovleva and Askerov.

Further, multiple pieces of evidence suggest that Valenko himself was the perpetrator.  For one thing, there were two witnesses, Iodko and Prevorukhova, who testified that, shortly after Jakovleva was last seen alive, Valenko appeared to have been in an altercation.  (*See* Trial Tr. at 56:17–57:15 (Iodko), 325:20–:25 (Prevorukhova)).  And Valenko gave different and contradictory explanations to each witness about the evident bruising, scratches, and abrasions on his face: he told Iodko that he was kickboxing, (*id.* at 57:16–:21), and he told Prevorukhova that he was robbed by two black men, (*id.* at 325:20–326:07).  He also told Iodko that Jakovleva and Askerov had moved out of state, (*id.* at 54:13–:15), a story that Iodko was easily able to confirm as false by finding that Askerov's car remained parked in its original location in Brooklyn, (*id.* at 59:03–:08).  Furthermore, shortly afterwards, Valenko fled to Ukraine; he remained a fugitive for thirteen years.  (*See id.* at 196:22–197:09, 201:03–:08, 209:04–:16).

All of this—his flight to Ukraine,[7] his uncorroborated and contradictory explanations of the facial injuries, the false account of the victims' whereabouts, and the purchasing of the circular saw with one of the victim's credit cards—are indicia of consciousness of guilt, which any jury could have relied upon in reaching the conclusion that Valenko was guilty of a crime. *See, e.g.*, *People v. Fama*, 212 A.D.2d 542, 543 (2d Dep't 1995) (evidence of flight); *People v. Carney*, 166 A.D.2d 157, 158 (1st Dep't 1990) (inconsistent explanations of conduct); *People v. Levine*, 65 N.Y.2d 845, 846–47 (1985) (false statements about why defendant obtained and used murder victim's credit card); *see also People v. Bennett*, 79 N.Y.2d 464, 469–70 (1992) (collecting cases). And a jury could have concluded that the crime he had committed was murder.

Days after Jakovleva and Askerov were last seen alive, a person matching Valenko's description used Askerov's credit card to purchase a circular saw. (Trial Tr. at 74:09–:12, 75:06–:13, 76:02–78:21, 79:23–80:04). Jakovleva and Askerov's bodies were found showing postmortem dismemberment consistent with the use of such a saw. (*Id.* at 393:18–:25). The apartment where Jakovleva and Askerov lived with Valenko

---

[7] Valenko argues that his flight from the United States "adds almost nothing" because "[i]t is well established that flight is weak evidence of guilt." (Pet. at 31). "It is well settled that evidence of flight is admissible as circumstantial evidence of consciousness of guilt." *People v. Yaghnam*, 135 A.D.2d 763, 764 (2d Dep't 1987). "Once such evidence is admitted, the defendant is entitled to explain his reason for fleeing." *Id.* In the case Valenko relies on, *Gilmore v. Henderson*, 825 F.2d 663, 666 (2d Cir. 1987), (*see* Pet. at 31), the writ of habeas corpus was granted where, among other things, the state trial court instructed the jury that the petitioner's flight was "unexplained" and potentially "indicative of guilt" while it simultaneously precluded the petitioner from introducing his explanation for his flight. In contrast, Valenko was not barred from presenting an alternate explanation for leaving the United States; he argues that "even innocent people have a motive to extricate themselves from difficult circumstances" and that he already planned to leave the country. (Pet. at 31). Thus, the authority he relies on is inapposite; and even assuming the evidence is "weak," it was not the sole fact that pointed to guilt, and certainly is consistent with a conclusion that he was the perpetrator.

was seen a few days after their disappearance cleaned and missing a rug, towels, and bed linens. (*Id.* at 330:14–331:16). And when police visited the apartment a few months later, there were evidence of blood stains throughout the apartment. (*Id.* at 108:12–:18, 281:23–284:07, 285:14–287:12). As such, a jury could have concluded that the murder took place at Valenko's apartment and importantly—given Valenko's facial bruising, dissembling explanations about their cause, and his flight to Ukraine—that he was the perpetrator.

Valenko's various arguments about the evidence boil down to a single contention: the evidence pointed to Balachov as the murderer, not Valenko. (*See, e.g.*, Pet. at 25, 31–32). To that end, he points out that Balachov was the only person actually seen with the bodies of the victims, that Balachov also lived in the apartment, and Balachov also fled the United States. (*Id.* at 25). To that end, Valenko contends that the evidence shows that he was present at the crime scene, and at best, he was involved in postmortem dismemberment, not the murder. (*Id.* at 25–26). The problems with these arguments are manifold.

For one thing, while the evidence could be interpreted in the manner Valenko suggests, the evidence could also rationally be interpreted to reach the opposite conclusion: that Valenko, not Balachov, was the perpetrator. In other words, that the evidence points to Balachov as the murderer does not mean that the conclusion that Valenko was the murderer is irrational. And that conclusion is what is required for habeas relief, *i.e.*, that no rational jury could have reached the conclusion that Valenko was responsible for murder. As explained above, it was certainly rational, and indeed quite reasonable, for a jury to conclude that Valenko was guilty of murder.

For another, Valenko's arguments about his minimal role in the murders ignore the presence of the acting-in-concert instruction. Valenko's arguments—even if fully credited—do not mean that the jury's verdict was wrong; the jury could have credited all of those arguments about the evidence and *still* found Valenko guilty of first-degree murder because he was acting along with Balachov. (And for the reasons explained below, Valenko's arguments about the acting-in-concert instruction are without merit).[8]

Valenko tries to analogize his case to *People v. La Belle*, where the New York Court of Appeals overturned a murder conviction of a defendant who was only present during the disposal of the victim's bodies and no evidence linked him to the actual commission of the murder itself. 18 N.Y.2d 405, 410–11 (1966); (*see* Pet. at 25–26). There, the evidence linking the defendant to the

> murder was circumstantial evidence, placing the defendant at the scene of the crime and even indicating that he co-operated with his brother after the killing in disposing of the body and in attempting to remove evidence of the crime, but not ruling out the possibility that this defendant was without knowledge of his brother's intention to kill[.]

*La Belle*, 18 N.Y.2d at 411–12. *La Belle* is of little assistance to Valenko. The evidence here was not just that Valenko was present at the apartment where Jakovleva and

---

[8] As for the other elements, the evidence was sufficient for the jury's verdict. From expert testimony and Iodko's identification of the birthmark on the female body, a rational jury could have inferred that the bodies recovered in South Mountain Reservation and Plum Beach belonged to Askerov and Jakovleva. And from expert testimony about the injuries on the bodies, as well as the photographs, only described in the record, a jury could likewise have inferred that they were intentionally killed. Based on the testimony about the forensic analysis of Apartment 2H, especially if the luminol testing was credited, and the testimony from Prevorukhova and the NYPD officers about how the apartment had been cleaned and items were missing, a reasonable juror could have determined that Askerov and Jakovleva were both murdered there on November 12, 1995. And crediting the timeline of Iodko's testimony, a juror could have reasonably found that they were murdered as part of the same criminal transaction. Evidence was also presented that Valenko was over eighteen on November 12, 1995. (Trial Tr. at 565:05–:12))).

Askerov lived, but that he killed them: among other things, he had facial bruising and injuries consistent with being in a violent altercation, (Trial Tr. at 56:17–57:15, 325:20–:25), and he admitted to his landlord that he may have killed someone, (*id.* at 326:05–:09). Furthermore, *La Belle* arose on direct review of a conviction; on habeas review, the Court does not apply a naked sufficiency of the evidence test, but defers to the jury's verdict, and can only set it aside if *no* rational jury could have reached the conclusion of guilt. *Epps*, 687 F.3d at 56 ("Viewing the evidence in the light most favorable to the verdict, and deferring to the New York courts on the question of what elements need to be proved to support a conviction for depraved-indifference murder, we cannot conclude that *no* rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt."). As explained, that is not the case here.

Valenko also contends that the jury could only have found him guilty by leaping over "logical gaps in the proof." (Pet. at 24–25 (quoting *People v. Benzinger*, 36 N.Y.2d 29, 32 (1974))). "The rule that circumstantial evidence must logically point to the defendant's guilt and exclude to a moral certainty every other reasonable hypothesis of innocence ensures that the trier of fact use careful reasoning and not leap logical gaps in the proof or draw unwarranted conclusions based on weak probabilities." *People v. LaBruna*, 66 A.D.2d 300, 303 (4th Dep't 1979). To that end, Valenko puts forth a series of arguments about the quality and quantum of evidence—including that his trip to Ukraine was preplanned, that the luminol could have been identifying substances other than blood, that the blood in the apartment was never identified, that no evidence suggested that a violent struggle took place in the apartment, and that the description of the purchaser of the circular saw was inconsistent with Valenko's appearance and build, among other arguments. But Valenko misapplies and misapprehends *Benzinger*.

18

For there to be "logical gaps" in proof, the jury's conclusion that Valenko was guilty must have been drawn from "unreasonable inferences," or not "flow[] naturally" from the evidence. *Id.* ("The conclusion that Albini intended to kill the victim and that defendant shared this intent flowed naturally from the evidence, and there was no fact inconsistent with this conclusion. The jury did not draw unreasonable inferences." (applying *Benzinger*)). Neither is true here. Each of the arguments about the evidence was presented to the jury by Valenko's counsel during closing argument. (Trial Tr. at 481:24–483:25, 487:07–:16, 488:16–:23, 489:21–:24, 498:25–499:11). And the jury rejected them. (*Id.* at 624:13–:20). That the jury could have accepted them, and could have found Valenko not guilty, does not mean that the jury's ultimate conclusion was illogical or unreasonable. *See, e.g.*, *Epps*, 687 F.3d at 55–56. Because "[f]ederal courts are not forums in which to relitigate state trials," *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999) (quoting *Herrera v. Collins*, 506 U.S. 390, 401 (1993)), or to "to make [their] own subjective determination of guilt or innocence," *id.* (quoting *Herrera*, 506 U.S. at 401), the question is only whether *any* rational jury could have reached the verdict here, *Jackson*, 443 U.S. at 307. And for the reasons stated above, a rational jury could have reached the conclusion that Valenko was guilty of murder.

In any event, Valenko assumes that a *Benzinger* error would entitle him to habeas relief. Not so. *Benzinger* is the state court standard for the sufficiency of evidence, and here, the Appellate Division concluded that the evidence against Valenko was "legally sufficient to establish the defendant's guilt beyond a reasonable doubt." *Valenko*, 126 A.D.3d at 1020. And in conducting an "independent review" of the record, it was "satisfied that the verdict of guilt was not against the weight of the evidence." *Id.* This Court's review of that determination is "deferential." *Epps*, 687 F.3d at 50;

19

*Acevedo v. Capra*, No. 13-CV-5579, 2014 WL 1236763, at *5 (E.D.N.Y. Mar. 25, 2014) ("In sum, to obtain relief on an insufficiency claim, [Supreme Court precedent] require[s] a finding that both the jury's verdict and the state court's review of the jury's verdict represent conclusions by each that at least border on the irrational."), *aff'd*, 600 F. App'x 801 (2d Cir. 2015).

Apparently aware of this deference, Valenko attempts also to analogize his case to those where federal courts have granted relief based on insufficient evidence challenges. None of the cases cited are apposite.

In *O'Laughlin v. O'Brien*, the First Circuit granted a petition for habeas corpus based on insufficient evidence. 568 F.3d 287, 290 (1st Cir. 2009). But in *O'Laughlin*, "there was no physical or forensic evidence linking [the petitioner] to the crime scene; [his] financial motive was inconsistent with the evidence in [the victim]'s apartment; and [the petitioner] presented compelling third-party evidence that [the victim's husband] was the actual assailant." *Id*. at 308. Here, Valenko was tied to the crime scene, namely the apartment, made a series of false statements and took actions that reflected consciousness of guilt, and had physical bruising and facial injuries that suggested involvement in an altercation. Further, the blood evidence in *O'Laughlin* suggested that someone else entirely was responsible for the murder rather than the petitioner—the panel noted that the prosecution relied solely on circumstantial evidence because, although a "copious amount of blood" was found at and analyzed from the crime scene, none of it connected the defendant to the victim. *O'Laughlin*, 568 F.3d at 304 ("It bears repeating that the prosecution had to rely on circumstantial evidence because no physical or DNA evidence linked O'Laughlin to the attack despite the copious amount of blood at the crime scene. Considering the large amount of blood, it is

difficult to fathom how O'Laughlin was able to avoid having any blood or other DNA evidence connect him to [the victim].").  Yet here, while Valenko attempts to pin the murders on Balachov, the evidence was—at a minimum—sufficient to suggest that Valenko was acting in concert with Balachov, which would have permitted the jury to reach its verdict with respect to Valenko; there was no evidence that an unaffiliated third-party perpetrator was responsible.

Valenko's reliance on *McKenzie v. Smith*, 326 F.3d 721 (6th Cir. 2003), (*see* Pet. at 32–33), is similarly misplaced.  In *McKenzie*, the Sixth Circuit granted a writ where the principal evidence of the defendant's guilt was an out-of-court statement made by the victim, who was three years-old, traumatized, and deemed incompetent to testify at trial.  326 F.3d at 728.  Further, witnesses recounted different versions of the victim's statement.  *Id*.  Otherwise, the verdict rested solely on circumstantial evidence; there was no physical or identification evidence tying the defendant to the crime.  *See id*. Valenko does not—and cannot—point to any similarly problematic out-of-court statement that could have so inflamed the jury as to justify collateral vacatur of his conviction, and for the reasons above, there is more significant circumstantial evidence that tied Valenko to the murders.

Valenko also relies on *Juan H. v. Allen*, (*see* Pet. at 36), where the petitioner was found guilty of aiding and abetting first-degree murder after the petitioner, then fifteen years-old, followed his older brother outside their family home, watched him shoot two people, ran home while his brother drove away, lied to the police about being present, and had prior altercations with the victims.  408 F.3d 1262, 1266–69 (9th Cir. 2005). The Court of Appeals reversed, finding that "the record does not reflect any evidence that Juan H. intended, through his actions, to assist Merendon in committing first-

degree murder.  Juan H. did not do or say anything before, during or after the shootings from which a reasonable factfinder could infer an intent or purpose to aid and abet in the murder of Ramirez and the attempted murder of Magdelano." *Id.* at 1278–79.  *Juan H.* is quite to the contrary here: evidence of Valenko's intent was abundant—his pattern of lies, purchase of a circular saw using the victim's credit card, and flight.  For the same reason, *Newman v. Metrish*, where the underlying conviction rested solely on vague circumstantial evidence, is also inapposite, since its facts are unique and unlike the present case.  543 F.3d 793, 797 (6th Cir. 2008) ("We can infer only that Newman intended to rob a drug dealer and knew that Chappelear was a drug dealer, that a gun previously owned by Newman was used to kill Chappelear, and that a similar looking gun was seen in Newman's home approximately two weeks before the murder. However, the witness who saw the gun said she could not say for sure that it was the same one used in the homicide because the gun was in a laundry bin and it was dark. Further, even assuming that Newman's gun was indeed the one used in the homicide, there was no evidence of what happened to it between that date and the date of the homicide, and we need not speculate as to what might have happened.").

While the evidence against Valenko is purely circumstantial, for the reasons stated above, it is sufficient to survive collateral review, unlike the evidence presented in *O'Laughlin*, *McKenzie*, *Juan H.*, and *Newman*.[9]  Thus, the Court concludes that Valenko has not shown that no reasonable jury could have found him guilty of first-degree murder based on the evidence presented at trial.

---

[9] The final case Valenko relies on, *United States v. Ogando*, 547 F.3d 102 (2d Cir. 2008), (*see* Pet. at 32 n.4), is a direct appeal of a conviction following a *federal* jury trial, and subject to a different analysis from review of Valenko's state court conviction.

II.   <u>The Acting-in-Concert Instruction Was Proper</u>

Valenko argues that the acting-in-concert instruction to the jury was improper, given without an evidentiary foundation and in violation of his due process rights. (Pet. at 37–42). This claim was fairly presented to the state court and is appropriately considered on habeas review. (Sentencing Tr. at 2:11–3:03); *Valenko*, 126 A.D.3d at 1020; *see Vega*, 2020 WL 2738229, at *7.

The Second Circuit "has repeatedly held that '[i]n order to obtain a writ of habeas corpus in federal court on the ground of error in a state court's instructions to the jury on matters of state law, the petitioner must show not only that the instruction misstated state law but also that the error violated a right guaranteed to him by federal law.'" *Davis v. Strack*, 270 F.3d 111, 123 (2d Cir. 2001) (alteration in original) (quoting *Casillas v. Scully*, 769 F.2d 60, 63 (2d Cir. 1985)); *see, e.g.*, *Mejias v. Allard*, No. 03-CV-195, 2006 WL 119033, at *11–15 (E.D.N.Y. Jan. 13, 2006) (adopting report and recommendation). In reviewing constitutional errors in state court trials, the Supreme Court has "distinguished between, one the one hand, 'structural defects in the constitution of the trial mechanism, which defy analysis by harmless-error standards,' and, on the other hand, trial errors which occur 'during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented.'" *Sullivan v. Louisiana*, 508 U.S. 275, 281 (1993) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 291 (1991)). Improper jury instructions can constitute "structural" error in limited circumstances. *See id.* For example, a jury instruction that defines "reasonable doubt" so expansively that the state is not required to prove a criminal defendant's guilt beyond a reasonable doubt violates a criminal defendant's constitutional rights. *See id.* If a court finds such a "structural" error in a state court

proceeding on collateral review, the conviction must be set aside regardless of the instruction's impact on the proceeding. *Brecht v. Abrahamson*, 507 U.S. 619, 629–30 (1993); *see also Neder v. United States*, 527 U.S. 1, 8 (1999) (collecting cases on "structural" errors).

Where an instruction does not create "structural" error, but instead a "trial" error, a court may issue a writ of habeas corpus only where the instruction had a "substantial and injurious effect or influence" on the verdict. *Hedgpeth v. Pulido*, 555 U.S. 57, 58 (2008) (per curiam) (quoting *Brecht*, 507 U.S. at 638). For example, a jury instruction that omits or misstates a required element of an offense is reviewed under this standard. *Id.* at 60–61 (collecting cases).

A single jury instruction may constitute "structural" or "trial" error. *Cupp v. Naughten*, 414 U.S. 141, 147 (1973). But "[t]he question is not whether the trial court gave a faulty instruction," *Davis*, 270 F.3d at 123, but whether the faulty instruction "by itself so infected the entire trial that the resulting conviction violates due process," *Cupp*, 414 U.S. at 147.

Valenko challenges the delivery of an acting-in-concert liability charge to the jury in his trial.[10] After closing statements at trial, Justice Goldberg instructed the jury:

> In this case, based on the evidence you heard at the trial, it is unknown whether there was more than one person who committed the crimes charged. The People have to prove beyond a reasonable doubt that the defendant committed the crimes charged, but they do not have to prove whether or not other persons also participated in these crimes.
>
> Our law recognizes that two or more individuals may act jointly to commit a crime, and that in certain circumstances each can be held criminally liable not only for the person's own acts but also for the acts of the other person.

---

[10] Valenko does not argue that the instruction itself was flawed, but that the instruction should not have been given at all. (*See* Pet. at 39 n.5).

In that situation, those persons can be said to be acting in concert with one another.

Our law defines the circumstances under which one person may be criminally liable for the conduct of another. That definition is as follows: When one person engages in conduct which constitutes an offense, another is criminal liable for such conduct when acting in a state of mind required for the commission of that offense he solicits, requests, commands importunes or intentionally helps or aids such person to engage in such conduct.

Under that definition, mere presence at the scene of the crime, even with knowledge that the crime is taking place, or mere association with a perpetrator of a crime does not by itself make a defendant criminally liable for that crime.

In order for the defendant to be held criminally liable for the conduct of another person which constitutes an offense, you must find beyond a reasonable doubt (1) that the defendant solicited, requested, commanded, importuned or intentionally aided such other person to engage in that conduct; and (2) that the defendant did so with the state of mind required for the commission of the offense. If it is proven beyond a reasonable doubt that the defendant is criminally liable for the conduct of another, the extent or degree of the defendant's participation in the crime does not matter. A defendant proven beyond a reasonable doubt to be criminally liable for the conduct of another in the commission of a crime is as guilty of the crime as if the defendant personally had committed every act constituting the crime. The People have the burden of proving beyond a reasonable doubt that the defendant acted with the state of mind required for the commission of the crime, and then either personally or by acting in concert with another person committed each of the remaining elements of the crime.

Your verdict, whether guilty or not guilty, must be unanimous in order to find the defendant guilty; however, you need not be unanimous on whether the defendant committed the crime alone or by acting in concert with another person.

. . .

[I]n order for you to find the defendant guilty of Murder in the First Degree, the People are required to prove from all of the evidence in the case, beyond a reasonable doubt, each of the following five elements: (1) That on or about November 12th, 1995, in the County of Kings, the defendant, either personally or acting in concert with another person or persons, caused the deaths of Fakhat Askerov and Larisa Jakovleva by stabbing them; (2) that the defendant did so with the intent to cause the death of Fakhat Askerov and the intent to either cause the death or serious physical injury to Larisa

> Jakovleva; and (3) that the defendant caused both deaths during the same criminal transaction; and (4) that neither victim was a participant in the criminal transaction; and (5) that the defendant was more than 18 years old at the time of the commission of the crime.

(Trial Tr. at 555:25–558:04, 564:13–565:04). At the charge conference, the prosecution outlined its reasons why the evidence supported the acting-in-concert charge: Hall identified Balachov leaving the suitcases with body parts in the South Mountain Reservation and Weingand identified two individuals purchasing the circular saw. (*Id.* at 358:14–359:04). Valenko objected, but Justice Goldberg ultimately concluded that the charge was appropriate. (*See id.* at 360:13–361:13).

The Court finds that giving the acting-in-concert instruction was appropriate under New York law. *See, e.g.*, *Davis*, 270 F.3d at 123 n.4 ("In other words, our role here is not to interpret New York's law of justification, but to determine whether the evidence was sufficient to warrant a justification charge under that law.").

An acting-in-concert charge has the effect of holding an accomplice to the crime as culpable as a principal. N.Y. Crim. Jury Instructions 2d, at 24 n.69 (2021) ("The term 'acting in concert' is included in this charge in order to create a term that easily can be used in the appropriate element of a charged crime to incorporate by reference the definition of accessorial liability."); *People v. Rivera*, 84 N.Y.2d 766, 769 (1995) ("[T]here is no legal distinction between liability as a principal or criminal culpability as an accomplice."). The effect of the acting-in-concert instruction was to permit the jury to convict Valenko even if it concluded that Balachov committed the murders: Valenko is guilty of a crime which "was proved by showing that the act although committed by a third person, and in the absence of the defendant, was so committed by his aid and procurement." *People v. Bliven*, 112 N.Y. 79, 88 (1889). As codified in Penal Law

section 20.00, "a person, although not the principal actor, may nonetheless be criminally liable as though he/she were the principal actor when 'acting with the mental culpability required for the commission thereof, he solicits, requests, commands, importunes, or intentionally aids [the principal] to engage in such conduct.'" *Rivera*, 84 N.Y.2d at 771 (alteration in original) (quoting N.Y. Penal Law § 20.00).

Under New York law, a jury charge is appropriate where "there was a reasonable view of the evidence to support the charge." *Valenko*, 126 A.D.3d at 1020 (quoting *People v. Rizzo*, 78 A.D.3d 1641, 1642 (4th Dep't 2010)).  It would have been appropriate to give the acting-in-concert instruction if the evidence reasonably showed that Valenko intentionally aided Balachov in killing Askerov and Jakovleva.

For example, in *People v. Pierre*, the First Department found that an instruction on accessorial liability was supported by "a reasonable view of the evidence" where

> it was the People's theory that defendant had killed the victim himself and was assisted by the accomplice only in disposing of the body, there was some evidence—elicited by the defense on cross-examination—that she may have been killed by the accomplice.  However, the circumstantial evidence supports the inference that if the accomplice killed the victim, he did so at the behest of and in cooperation with defendant.

41 A.D.3d 289, 290 (1st Dep't 2007).[11]

And here, like in *Pierre*, there was circumstantial evidence that Valenko aided Balachov—even if Balachov was the principal perpetrator—in killing the two victims. Hall testified that he saw Balachov leave the suitcases with the bodies in South Mountain Reservation.  (Trial Tr. at 135:04–137:01, 244:16–247:16, 256:18–258:05).

---

[11] The Southern District of New York denied the defendant's petition for a writ of habeas corpus following his conviction, concluding that the jury charge on accomplice liability was "reasonably supported" by the evidence. *Pierre v. Ercole*, No. 08-CV-10849, 2012 WL 3029903, at *7–8 (S.D.N.Y. July 25, 2012), *aff'd*, 560 F. App'x 81 (2d Cir. 2014).

Weingand, the hardware store employee, testified that two men, who matched the description of Valenko and Balachov, used Askerov's credit card to purchase a circular saw, (*id.* at 74:09–:12, 75:06–:13), and the forensic pathologist testified that the dismemberment of the two bodies was consistent with a circular saw, (*id.* at 393:18–:25). This evidence points to Balachov's involvement *and* Valenko's intentional assistance in the murders. And certainly, given Valenko's dissembling about the victim's whereabouts, his own facial injuries, and his flight, there was evidence that Valenko provided that assistance intentionally. That this evidence could be interpreted in another fashion—for example, that Balachov was the perpetrator, and Valenko's acts were only consistent with after-the-fact assistance, like dismemberment of the bodies—does not mean that the instruction was improper, particularly since this evidence must be viewed in a light favorable to the prosecution, s*ee People v. Weiner*, 226 A.D.2d 757, 758 (3d Dep't 1996).

The charge was appropriate under New York law. *E.g.*, *People v. Alexander*, 169 A.D.3d 571, 572 (4th Dep't) ("A theory that defendant intentionally aided a particular other person, who did the actual shooting, was supported by defendant's own testimony. Although defendant claimed he had not shared the gunman's intent, such intent could be inferred from the totality of the evidence."), *leave to appeal denied*, 34 N.Y.3d 927 (2019). Because Court finds that the instruction was proper under New York law, the Court does not reach the question of constitutional error. *Davis*, 270 F.3d at 123.

III.    Certificate of Appealability

Rule 22(b) of the Federal Rules of Appellate Procedure provides that "[i]n a habeas corpus proceeding in which the detention complained of arises from process issued by a state court, . . . the applicant cannot take an appeal unless a circuit justice or

a circuit or district judge issues a certificate of appealability under 28 U.S.C. § 2253(c)." Fed. R. App. P. 22(b)(1).  A certificate of appealability should issue if the petitioner "shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right, and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 478 (2000); *see also* 28 U.S.C. § 2553(c)(2) ("A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right.").  Valenko has failed to make a substantial showing of a violation of a constitutional right.  As such, the Court recommends that no certificate of appealability should issue.  *See, e.g.*, *Vega*, 2020 WL 2738229, at *12 (concluding that a certificate of appealability should not issue because the petitioner had not demonstrated a substantial showing of a denial of a constitutional right or shown there was a debate as to whether the claims were procedurally defaulted).

## CONCLUSION

The Court respectfully recommends the petition for a writ of habeas corpus be denied.  Further, the Court recommends that a certificate of appealability not issue.  Any objections to the Report and Recommendation above must be filed with the Clerk of the Court within 14 days of receipt of this report.  Failure to file objections within the specified time waives the right to appeal any judgment or order entered by the District Court in reliance on this Report and Recommendation.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); *Caidor v. Onondaga County*, 517 F.3d 601, 604 (2d Cir. 2008) ("[F]ailure to object timely to a magistrate [judge's] report operates as a waiver of any further judicial review of the magistrate [judge's] decision.").

SO ORDERED.

*/s/ Sanket J. Bulsara* January 19, 2021

SANKET J. BULSARA
United States Magistrate Judge

Brooklyn, New York