UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------

ANATOLY VALENKO,

                  Plaintiff,

          v.

DALE ARTUS, Superintendent Green Haven
Correctional Facility,[1]

                  Defendants.

-------------------------------------------------------------

**MEMORANDUM & ORDER**
16-CV-5089 (MKB) (SJB)

MARGO K. BRODIE, United States District Judge:

      Petitioner Anatoly Valenko, currently incarcerated at Green Haven Correctional Facility, brings the above-captioned action for a writ of habeas corpus pursuant to 28 U.S.C. § 2254(d). (Pet., Docket Entry No. 1.)  Petitioner's grounds for relief arise from a judgment of conviction in New York Supreme Court, Kings County (the "State Court"), for murder in the first degree in violation of New York Penal Law ("N.Y.P.L.") § 125.27(1)(a)(viii).  (Pet. ¶¶ 1, 5.)  Petitioner alleges that: (1) he was denied "his constitutional right to be convicted only upon proof beyond a reasonable doubt, and the affirmance of that conviction was an unreasonable application of clearly established federal law," (Pet. 21–37), and (2) the State Court violated Petitioner's due process right to a fair trial by erroneously instructing the jury on an acting in concert instruction, (*id.* at 37–42).  On July 8, 2020, the Court referred the petition to Magistrate Judge Sanket J.

---

[1] Although Artus may no longer be the appropriate respondent, the Court declines to substitute another official.  At the time the Court received the petition on September 13, 2016, Artus was the appropriate respondent because Petitioner was "in custody under a state-court judgment," and Artus was the "the state officer who ha[d] custody."  Rule 2(a) Gov'g § 2254 Cases in U.S. District Cts.  Rather than substitute the new appropriate respondent, *see* Fed. R. Civ. P. 25(d), the Court leaves the case caption unchanged because, as explained below, the petition fails on its merits and the Court therefore has no occasion to order any relief.

Bulsara for a report and recommendation.  (Order dated July 8, 2020.)  By report and

recommendation dated January 19, 2020, Judge Bulsara recommended that the Court deny the

petition (the "R&R").  (R&R, Docket Entry No. 8.)  On February 1, 2020, Petitioner filed

objections to the R&R.  (Pet'r's Obj. to R&R ("Pet'r's Obj."), Docket Entry No. 10.)

    For the reasons set forth below, the Court adopts the R&R and dismisses the petition.

## I.   Background

    The Court assumes familiarity with the facts of the case as set forth in detail in the R&R

and in *People v. Valenko*, 6 N.Y.S.3d 142 (App. Div. 2015), *appeal denied*, 25 N.Y.3d 1172

(2015), but provides a summary of the relevant facts and procedures.

### a.   Factual background

    On December 13, 2011, following a jury trial, Petitioner was convicted of murder in the

first degree, (Trial Tr. Part 4 ("Trial Tr. IV") 263:13–20, annexed to Resp't's Resp. to Order to

Show Cause ("Resp't's Opp'n") as Ex. A, Docket Entry No. 6-4),[2] for the murder of Larisa

Jakovleva and Fakhat Asherov (the "victims"), (*id.* at 270:06–11).  Justice Joel M. Goldberg

presided over the trial and sentenced Petitioner to life without parole.  (*Id.* at 279:01–17.)

#### i.   Last sighting of Larisa Jakovleva and Fakhat Askerov on November 12, 1995

    The victims — Jakovleva and Askerov — were romantic partners who shared an

apartment with Petitioner and Vladimir Balachov at 1800 East 12th Street, Apartment 2H, in

Brooklyn, New York ("Apartment 2H").  (Pet. 5–6.)  On November 12, 1995, at around

10:00 AM, Askerov set out to drive to New Jersey to "pay his bills," accompanied by Jakovleva

and her close friend, Ludmila Iodko, (*id.* at 6; Trial. Tr. Part 2 ("Trial Tr. II") 217:07–218:02,

---

    [2]  Because the exhibits are not consecutively paginated, the Court refers to the page
numbers assigned by the electronic filing system.

218:17–219:13, annexed to Resp't's Opp'n as Ex. A, Docket Entry No. 6-2), but after encountering heavy traffic, decided to turn around and head back home, (Pet. 6; Trial Tr. II 219:15–25).  Once they arrived home, Askerov parked his car in the garage behind the apartment building and went to the hardware store to get a new lock for the apartment while Iodko and Jakovleva went to the grocery store to buy food for dinner.  (Pet. 6; Trial Tr. II 220:01–04, 221:16–17.)  Around 6:00 PM that evening, Iodko joined the victims for dinner in their apartment.  (Pet. 6; Trial Tr. II 52:18–19.)  After dinner, around 9:00 PM, Iodko, Askerov and Jakovleva walked to visit their friends — Alexander and Marina.  (Pet. 6; Trial Tr. II 220:22–221:06, 221:20–21, 232:20–233:13.)  Around 10:00 PM, Iodko got a ride back to her home in Manhattan from Alexander and the victims walked back to their apartment.  (Pet. 6; Trial Tr. II 221:22–222:2.)  Before Iodko left, Jakovleva asked that she call her the next day.  (Pet. 6; Trial Tr. II 222:07–11.)

As promised, Iodko called Jakovleva the next morning, but was unable to reach her.  (Pet. 7; Trial Tr. II 222:12–19.)  Iodko continued to call "every hour," starting at around 8:00 AM, with no answer, (Pet. 7; *see also* Trial Tr. II 222:12–25), until finally, around 8:00 PM, Petitioner answered the phone and told Iodko that Jakovleva's relatives came to visit and that she went with them to another state, (Pet. 7; Trial Tr. II 223:05–15).  Petitioner called Iodko again two days later, claiming that Jakovleva and Askerov left their apartment without paying rent and asked if Iodko would lend him money to cover the amount.  (Pet. 7; Trial Tr. II 224:19–225:03.)  Iodko agreed and when she met Petitioner in Manhattan the following day to lend him the money, she noticed a bruise and parallel scratches on Petitioner's face that he claimed were from a kickboxing class.  (Pet. 7–8; Trial Tr. II 225:05–226:21.)  Throughout the week, Iodko continued to try to reach Jakovleva by phone without success.  (*Id.* at 227:07–15.)  "Because 'nothing was

fitting together,'" Iodko decided to try and confirm that the victims had actually left the state, and went to their parking garage to see if Askerov's car was still there. (Pet. 8; Trial Tr. II 228:03–05.) When she reached the garage, she found Askerov's car was "in the same spot" where they left it the night of November 12, 1995, and noticed that the soda, raincoat, and snack wrappers she had left behind in the car from their trip to New Jersey remained undisturbed. (Pet. 8; Trial Tr. II 228:05–13.)

Around 10:00 PM or 11:00 PM on November 12, 1995, Petitioner visited Alla Perevorukhova, the landlord for Apartment 2H, (Trial Tr. Part 3 ("Trial Tr. III") 236:23–237:1, annexed to Resp't's Opp'n as Ex. A, Docket Entry No. 6-3), asking for the keys to Apartment 2H and explaining that he had been robbed by two "black males" who had stolen his keys and wallet. (Pet. 6; Trial Tr. III 236:23–237:17, 242:09–23.) Petitioner appeared nervous; he was shaking, missing an earring, bleeding, and had scratches on his hands and face. (Pet. 7; Trial Tr. III 243:20–25.) Petitioner told Perevorukhova that he punched the man who assaulted him and "was concerned he might have killed" him. (Pet. 7; Trial Tr. III 244:05–07.) Petitioner also mentioned that Askerov had put "an additional lock" on the door and indicated that Askerov "was involved in some criminal activities," but Perevorukhova did not attempt to obtain further information. (Pet. 7; Trial Tr. III 246:02–07.) Eventually, Perevorukhova gave Petitioner the keys, "gave him tea[,] . . . wiped his blood[,] . . . [and because he] was really nervous, . . . called for a car service for him." (Pet. 7; Trial Tr. III 244:10–16, 245:04–10.)

According to the testimony of Mitchell Weingand, a sales manager at Colony Hardware in Brooklyn, on November 13, 1995 — the day after the victims were last seen alive — he sold a circular saw to "[t]wo gentlemen slight of build, one slighter than the other, similar looking. One maybe with sandy blonde hair, kind of greasy looking[,] [t]he other more stocky," both around

five foot, seven inches tall.[3]  (Pet. 11; Trial Tr. II 242:07–244:13.)  At trial, the prosecution

introduced a credit card receipt from Colony Hardware in Brooklyn, indicating that on

November 13, 1995, Askerov's credit card was charged in the amount of $75, an amount

consistent with the cost of a circular saw, and the receipt was signed with an "X."  (Pet. 12; Trial

Tr. II 243:09–247:21.)

A couple days after Petitioner borrowed Perevorukhova's key to Apartment 2H, he called

to arrange a meeting to return the key.  (Pet. 8; Trial Tr. III 246:12–25.)  Petitioner also asked

Perevorukhova to lend him $100.  (*Id.* at 247:19–22.)  Perevorukhova agreed and they made the

exchange a few days after his call.  (*Id.* at 247:13–24.)  In total, Perevorukhova loaned Petitioner

around $400, not including the rent money he owed "for the last month rent."  (Pet. 8; Trial Tr.

III 248:03–05.)

On November 18, 1995, Perevorukhova visited Apartment 2H and found that neither lock

to the outside apartment door had been changed as Petitioner had claimed on the night of

November 12, 1995.  (Pet. 8; *see also* Trial Tr. III 248:14–249:02.)  In addition, she noticed that

apartment was "unusually" clean, linens were missing, and the foyer rug that had been present

the last time she visited the apartment on October 18, 1995, was gone.[4]  (Pet. 9; Trial Tr. III

249:03–24.)

---

[3]  At trial, Perevorukhova identified the prosecution's Exhibits 37 and 38 as being
photographs of Petitioner and Balachov as they appeared in 1995.  (Trial Tr. III 240:03–241:10.)
In Respondent's opposition brief, Respondent contends that "the photograph of [Petitioner],
seated on the left in People's Exhibit 38, shows him as being a good-looking young man with
sandy-colored hair."  (Resp't's Opp'n 5.)  Exhibit 38 is not included in the record before the
Court.

[4]  Perevorukhova testified that she typically would visit Apartment 2H "[o]nce a week or
maybe once in [ten] days."  (Trial Tr. III 238:16–18.)

### ii.   Police investigation

### 1.   Recovery and identification of the victims' bodies

On November 14, 1995, Timmy Hall was walking through a state park in New Jersey and spotted a man from about thirty feet away lifting suitcases from a blue or black pickup truck.[5] (Pet. 9; Trial Tr. III 163:01–12, 164:24–165:06.)  Hall observed that suitcases must have been heavy because the man was struggling to get them out of the back of the truck and had to drag the suitcases using both hands.  (Pet. 9; Trial Tr. III 163:01–12, 164:24–165:06.)  Hall described the man as thin and white with dark hair and a goatee.  (Pet. 9; Trial Tr. III 164:04–06, 165:23–166.)  Hall watched as the man dragged both suitcases "out of the back of the truck" to a spot in the parking area, about twenty feet away from his truck.  (Pet. 9; Trial Tr. 165:11–16.)  After removing the suitcases, the man returned to his truck and drove away.  (Pet. 9; *see also* Trial Tr. III 165:08–20.)  Hall later identified the man from a photographic array as Balachov — one of the residents of Apartment 2H.  (Pet. 11; Trial Tr. III 175:01–24.)

Curious about the contents of the suitcases, Hall walked over and "touched the top of the suitcase" and realized that "it wasn't an animal in that suitcase," as he had initially suspected, but that "[i]t felt like a human flesh . . . like a human body" inside.  (Pet. 9; Trial Tr. III 170:01–07.)  Hall then called his girlfriend, Karen Frohbose, an "E.M.S. [Emergency Medical Services] worker for Milburn Fire and Rescue Squad," and when she finished working that day, he took her to the suitcases.  (Pet. 9; Trial Tr. III 170:09–20.)  Using latex gloves, Frohbose opened the suitcase and found a female torso inside.  (Pet. 9; Trial Tr. III 170:19–171:02.)  Hall then called

---

[5]  During trial, Detective McCafferty testified that police attempted to locate Petitioner and Balochov at a previous residence in New Jersey — the Ivy Hill Towers — an apartment complex, located approximately three miles from where the suitcases were recovered. (Trial Tr. III 113:16–114:07.)

the police and waited at the scene until the police arrived.  (Pet. 9; Trial Tr. III 173–77.)

Detective Michael Prokopiw and Investigator Jim Gold responded to the scene and were

assigned to investigate the two deaths.  (Pet. 9–10; Trial Tr. III 45:06–11, 46:09–11.)

   On November 16, 1995, Anna Ladishenskaya was walking her dogs on Plum Beach in

Brooklyn when she came across a woman's leg and foot floating in the water.  (Pet. 10; Trial Tr.

III 11:02–8, 12:04–17.)  She immediately called the police and they arrived quickly at the scene.

(Pet. 10; Trial Tr. III 13:08–16.)  Four of the officers who responded to Ladishenskaya's call —

Arthur Semioli, Robert Sommer, William Menendez, and James McCafferty — testified at

Petitioner's trial.  (Trial Tr. III 16:04, 19:05–11, 67:24–25, 69:22–70:02, 85:03–04, 87:02–88:04,

94:02–03, 95:03–08.)  Detective Semioloi testified that he saw a male head and foot at the scene,

and that these body parts were subsequently taken to the Essex County, New Jersey Medical

Examiner's office where they were matched to the head and torso recovered from the suitcase in

New Jersey.  (Pet. 10; Trial Tr. III 19:12–23:21.)  Using dental records, a forensic dentist — Ira

Titunik — was able to identify the male body parts as belonging to Askerov.  (Pet. 11; Trial Tr.

III 51:04–52:09, 132:19–133:09, 148:21–149:06.)  The forensic pathologist who conducted

Askerov's autopsy, Carlos Fonseca, testified that there were numerous stab wounds on his body

and that the dismemberment occurred postmortem and was consistent with the use of a circular

saw.  (Pet. 15–16; Trial Tr. Part 4 ("Trial Tr. IV") 23:02–15, 31:01–32:25, annexed to Resp't's

Opp'n as Ex. A, Docket Entry No. 6-4.)  Fonesca was also present during the autopsy of

Jakovleva's body and testified that Jakovleva's body had stab wounds and likewise showed signs

of postmortem dismemberment.  (Pet. 15–16; Trial Tr. IV 41:02–43:15.)

## 2.   Investigation of Apartment 2H

On February 26, 1996, Detectives Semioli and McCafferty visited Apartment 2H to "see if the homicide occurred there." (Pet. 12; Trial Tr. III 24:12–18.) Detective Semioli "saw stuff on the wall which [he] thought was blood," and requested a luminol test be performed. (*Id.* at 25:2–4.) Detective Semioli also observed that rugs appeared to be missing and there were "some stains on [the] sofa and bed sheets, which [he] vouchered, assuming it was blood." (Pet. 12–13; Trial Tr. III 107:11–25.) In addition, the detectives vouchered pieces of rug and a metal door strip for forensic analysis. (Pet. 13; Trial Tr. III 26:25–27:01, 111:18–112:16.)

A forensic team performed the luminol test. (Pet. 12; Trial Tr. III 108:02–09, 187:23–188:13). Detective Semioli testified to observing that the luminol changed color to a "bluish" hue which was consistent, in his experience, with the presence of blood. (*Id.* at 108:12–18.) In addition, Detective McCafferty testified that the luminol illuminated marks on the wall, "from the light switch down to the floor," which appeared in "semi-circular" patterns that Detective McCafferty understood to be "wipe marks" and other marks that appeared as "splashes or spats." (Pet. 12; Trial Tr. III 108:14–110:16.) However, both detectives and Asako Ishii, a Criminalist in the Office of the Chief Medical Examiner, testified that in addition to reacting to blood, luminol may react with human saliva and other bodily fluids, animal liquids, and potentially other chemicals. (Pet. 12–13; Trial Tr. III 34:10–35:04, 123:09–124:18, 192:09–11, 193:11–20, 210:15–211:24.)

Ishii also testified that the DNA testing performed on the vouchered evidence recovered from the scene, including the door saddle, pieces of rug, bedspread, and couch cushion cover, indicated, with "a reasonable degree of scientific certainty," that there was blood on the door strip, rug fragments, and couch cover, and that the DNA profile of this blood matched the male

body parts recovered at Plum Beach and from the suitcase in New Jersey.  (Pet. 13; Trial Tr. III 196:24–197:03, 199:23–202:07.)  Testing revealed female blood on the bedspread, but the DNA profile did not match the recovered female body parts.  (Trial Tr. III 203:14–205:12.)  However, the DNA evidence indicated that the severed leg recovered at Plum Beach and the female torso found in New Jersey were from the same person, (Pet. 13–14; Trial Tr. III 205:05–24), and Iodko identified a birthmark on the neck area of the recovered female torso as belonging to Jakovleva, (Pet. 13–14; Trial Tr. IV 88:03–07).

### 3.   Extradition

In May of 1997, Detective McCafferty learned that Petitioner was living in Kiev, Ukraine, (Pet. 14; Trial Tr. III 115:22–116:09), but the local authorities refused to authorize Detective McCafferty to travel to Kiev and interview Petitioner, (Pet. 14; Trial Tr. III 116:10–21).  Detective McCafferty also learned that Balachov was living in St. Petersburg, Russia, but was unable to extradite Balachov due to the absence of an extradition treaty with Russia.  (Pet. 14; Trial Tr. III 117:11–118:01.)  Ten years later, in 2007, Detective McCafferty was informed by Interpol that Petitioner was residing in the Netherlands.  (Pet. 14; Trial Tr. III 118:15–23.)  Pursuant to an extradition order, Detective McCafferty traveled to the Netherlands and found Petitioner in Dutch custody in Gouda.  (Pet. 14–15; Trial Tr. III 119:01–25.)  Petitioner was subsequently extradited to the United States in 2008 for trial.  (Pet. 15; Trial Tr. III 120:03–08.)

### iii.   Trial

Petitioner's trial took place on October 18, 19, 20, and 26, 2011, in the State Court.[6]  (*See generally* Trial Tr. II; Trial Tr. III; Trial Tr. IV.)

---

[6]  Petitioner was tried alone in the absence of Balachov.  (Trial Tr. Part 1 32:21–33:2, annexed to Resp't's Opp'n as Ex. A, Docket Entry No. 6-1.)

At the close of evidence, defense counsel moved for dismissal, arguing that the evidence presented at trial was legally insufficient because the prosecution had failed to provide evidence of intent or establish a "nexus between [Petitioner] and [Balachov]." (Pet. 16; Trial Tr. IV 96:17–97:07.) The State Court denied defense counsel's motion, finding that although "there [was] no direct evidence of the [Petitioner's] commission of the crime, . . . there [was] sufficient circumstantial evidence to allow the case to go to the jury." (Pet. 16; Trial Tr. IV 98:13–18.)

At the charge conference, defense counsel objected to the court's decision to give an acting-in-concert charge, arguing that "[t]here has been not a scintilla of evidence that there [was] an acting in concert," and that both the Indictment and the bill of particulars indicated that there was only one party charged with the victims' murder. (Trial Tr. III 269:19–24.) In response, the prosecution argued that the evidence supported the acting-in-concert charge because: (1) Hall identified Balachov depositing the suitcases with body parts in New Jersey, and (2) Weingand testified that two individuals used Asherov's credit card to purchase the circular saw, the day after the victims went missing. (*Id.* at 276:14–277:04.) Over Petitioner's objections, the State Court concluded that the charge was appropriate, reasoning that "there was no evidence that only one person" committed the murders. (*Id.* at 278:13–279:13.) Accordingly, the State Court instructed the jury on the standard New York pattern instruction on acting-in-concert. (Pet. 17–18; Trial Tr. IV 102:14–103:06, 194:25–197:04, 564:13–565:04.)

After two days of deliberations, the jury convicted Petitioner of murder in the first-degree. (Pet. 19; Trial Tr. IV 263:17–20.) Petitioner moved to set aside the verdict, arguing that the jury was improperly charged on acting-in-concert liability and there was insufficient evidence to convict him. (Trial Tr. IV 268:11–3:03.) The State Court denied the motion, (*id.* at 270:02–03), and sentenced Petitioner to life in prison without parole, (*id.* at 279:01–07).

10

### b.   Procedural background

Petitioner appealed the verdict (the "Direct Appeal") to the State of New York Appellate Division, Second Department (the "Appellate Division"), arguing, *inter alia*, that: (1) the prosecution presented insufficient evidence of his guilt and the verdict was against the weight of the evidence, (State Ct. Direct Appeal Docs. 29–33, annexed to Resp't's Opp'n as Ex. 5, Docket Entry No. 6-5); and (2) the State Court erroneously "insisted on giving an acting in concert charge over defense counsel's objection" despite the instruction being unsupported by the evidence, (*id.* at 33–37).

On March 25, 2015, the Appellate Division affirmed Petitioner's conviction, finding that "[w]hile the [prosecution's] case was based entirely on circumstantial evidence, viewing the evidence in the light most favorable to the prosecution, and giving it the benefit of every reasonable inference to be drawn therefrom, . . . it was legally sufficient to establish the [Petitioner's] guilt beyond a reasonable doubt" and finding after conducting an independent review that "the verdict of guilt was not against the weight of the evidence." *People v. Valenko*, 6 N.Y.S.3d 142, 143 (App. Div. 2015) (collecting cases). In addition, the Appellate Division held that the State Court "properly instructed the jury on accomplice liability inasmuch as 'there was a reasonable view of the evidence to support the charge.'" *Id.* (quoting *People v. Rizzo*, 910 N.Y.S.2d 743, 743 (App. Div. 2010)).

Petitioner sought leave to appeal to the New York Court of Appeals, which was denied on June 16, 2015. *See People v. Valenko*, 25 N.Y.3d 1172 (2015).

On September 13, 2016, Petitioner filed a petition for a writ of habeas corpus in the Eastern District of New York. (Pet.) On July 8, 2020, the Court referred the petition to Judge

Bulsara for a report and recommendation.  (Order Referring Case dated July 8, 2020.)  On

January 19, 2021, Judge Bulsara filed an R&R.

    **c.   Report and recommendation**

    In the R&R, Judge Bulsara recommended that the Court deny the petition in its entirety.

As to Petitioner's insufficiency of the evidence claim, Judge Bulsara found that "a rational jury

could have convicted [Petitioner] based on the evidence presented at trial," noted that the fact

that "the evidence was 'wholly circumstantial' does not render it insufficient," and further noted

that "multiple pieces of evidence suggest that Valenko himself was the perpetrator."  (R&R 12–

14.)  Two witnesses — Iodko and Prevorukhova — testified that "shortly after Jakovleva was

last seen alive, [Petitioner] appeared to have been in an altercation," (*id.* at 14 (first citing Trial

Tr. II 225:17–226:15; and then citing Trial Tr. III 243:20–25)), and that Petitioner "gave

different and contradictory explanations to each witness about the evident bruising, scratches,

and abrasions on his face," (*id.* (first citing Trial Tr. II 226:16–21; and then citing Trial Tr. III

243:20–244:07)).  Iodko testified that Petitioner told her that Jakovleva and Askerov had left the

state, (*id.* (citing Trial Tr. II 223:13–15)), a story that Iodko confirmed was false when she found

Askerov's car parked in its original location in the parking garage near the victims' apartment in

Brooklyn, (*id.* (citing Trial Tr. II 228:03–08)).  At trial, Weingand testified that on November 13,

1995 — the day after the victims were last seen alive — he sold a circular saw to a man

matching Petitioner's description who used Askerov's credit card to make the purchase.  (*Id.* at

15 (citing Trial Tr. II 243:09–12, 244:06–13, 245:02–247:21, 248:23–249:04).)  In addition, the

forensic pathologist who conducted Askerov's autopsy testified that dismemberment occurred

postmortem and was consistent with the use of a circular saw.  (*Id.* (citing Trial Tr. IV 32:18–

25).)  Moreover, shortly after the victims disappeared, Petitioner "fled to Ukraine" where "he

remained a fugitive for thirteen years." (*Id.* (citing Trial Tr. III 1115:22–116:09, 120:03–08, 128:04–06).)  Prevorukhova testified that a few days after the victims' disappearance, Apartment 2H appeared to have been cleaned and was missing a rug, towels, and bed linens, (*id.* at 15–16 (citing Trial Tr. II 248:14–249:16)), and when police visited Apartment 2H a few months after the victims' disappearance, there were evidence of blood stains throughout the apartment, (*id.* at 16 (citing Trial Tr. III 28:12–18, 199:23–202:07, 203:14–205:12)).  Viewing the evidence as a whole — "[Petitioner's] flight to Ukraine, his uncorroborated and contradictory explanations of the facial injuries, the false account of the victims' whereabouts, and the purchasing of the circular saw with one of the victim's credit cards" — Judge Bulsara found "indicia of consciousness of guilt" on which the jury could have reasonably relied in convicting Petitioner following trial.  (*Id.* at 15 (collecting cases).)

Judge Bulsara also found that "giving the acting-in-concert instruction was appropriate under New York law," (*id.* at 26 (citing *Davis v. Strack*, 270 F.3d 111, 123 n.4 (2d Cir. 2001)), because as discussed above, "there was circumstantial evidence that Valenko aided Balachov — even if Balachov was the principal perpetrator — in killing the two victims," (*id.* at 27).  Finally, Judge Bulsara recommended that the Court deny a certificate of appealability under 28 U.S.C. § 2253(c) as no reasonable jurist could conclude that Petitioner made a substantial showing of a violation of a constitutional right.  (*Id.* at 29.)

### d.  Petitioner's objections to the R&R

Petitioner objects to Judge Bulsara's finding that a reasonable jury could have convicted Petitioner of murder based on the evidence presented, (Pet'r's Obj. 3–7), and to his finding that the State Court did not commit error by instructing the jury on acting-in-concert liability, (*id.* at 2–3).

## II.   Discussion

### a.   Standards of review

#### i.   Report and recommendation

A district court reviewing a magistrate judge's recommended ruling "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).  When a party submits a timely objection to a report and recommendation, the district court reviews *de novo* the parts of the report and recommendation to which the party objected.  *Id.*; *see also United States v. Romano*, 794 F.3d 317, 340 (2d Cir. 2015).  The district court may adopt those portions of the recommended ruling to which no timely objections have been made, provided no clear error is apparent from the face of the record.  *See John Hancock Life Ins. Co. v. Neuman*, No. 15-CV-1358, 2015 WL 7459920, at *1 (E.D.N.Y. Nov. 24, 2015) (applying the clear error standard when no objections to the magistrate judge's report and recommendation were filed).  The clear error standard also applies when a party makes only conclusory or general objections.  Fed. R. Civ. P. 72(b)(2) ("[A] party may serve and file specific written objections to the [magistrate judge's] proposed findings and recommendations."); *see also Colvin v. Berryhill*, 734 F. App'x 756, 758 (2d Cir. 2018) ("[M]erely referring the court to previously filed papers or arguments does not constitute an adequate objection under . . . Fed. R. Civ. P. 72(b)." (quoting *Mario v. P & C Food Mkts., Inc.*, 313 F.3d 758, 766 (2d Cir. 2002))); *Benitez v. Parmer*, 654 F. App'x 502, 503–04 (2d Cir. 2016) (holding that "general objection[s] [are] insufficient to obtain *de novo* review by [a] district court").

### ii.   Habeas petition

Under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), an application for a writ of habeas corpus by a person in custody pursuant to a state court judgment may only be brought on the grounds that his or her custody is "in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a). A petitioner is required to show that the state court decision, having been adjudicated on the merits, is either "contrary to, or involved an unreasonable application of, clearly established Federal law" or "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  *Id.* § 2254(d)(1)–(2); *see also Shoop v. Hill*, 586 U.S. ---, ---, 139 S. Ct. 504, 506 (Jan. 7, 2019) (per curiam) ("[H]abeas relief may be granted only if the state court's adjudication 'resulted in a decision that was contrary to, or involved an unreasonable application of,' Supreme Court precedent that was 'clearly established' at the time of the adjudication." (first quoting *White v. Woodall*, 572 U.S. 415, 419–20 (2014); and then citing *Metrish v. Lancaster*, 569 U.S. 351, 357–58 (2013))); *Kernan v. Hinojosa*, 578 U.S. 941, 941 (2016) (per curiam); *Woods v. Donald*, 575 U.S. 312, 313 (2015) (per curiam); *Johnson v. Williams*, 568 U.S. 289, 292 (2013).  "An 'adjudication on the merits' is one that '(1) disposes of the claim on the merits, and (2) reduces its disposition to judgment.'"  *Bell v. Miller*, 500 F.3d 149, 155 (2d Cir. 2007) (quoting *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001)); *see also Harrington v. Richter*, 562 U.S. 86, 98 (2011).  Under the section 2254(d) standards, a state court's decision must stand as long as "'fairminded jurists could disagree' on the correctness of the . . . decision."  *Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

For the purposes of federal habeas review, "clearly established law" is defined as "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *see also Glebe v. Frost*, 574 U.S. 21, 24 (2014) (per curiam) ("As we have repeatedly emphasized, however, circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court.'" (quoting 28 U.S.C. § 2254(d)(1))); *Parker v. Matthews*, 567 U.S. 37, 48 (2012) (per curiam) ("The Sixth Circuit also erred by consulting its own precedents, rather than those of this Court, in assessing the reasonableness of the [state] [c]ourt's decision."). A state court decision is "contrary to" or an "unreasonable application of" clearly established law if the decision (1) is contrary to Supreme Court precedent on a question of law, (2) arrives at a conclusion different than that reached by the Supreme Court on "materially indistinguishable" facts, or (3) identifies the correct governing legal rule but unreasonably applies it to the facts of the petitioner's case. *Williams*, 529 U.S. at 412–13. In order to establish that a state court decision is an unreasonable application of federal law, the state court decision must be "more than incorrect or erroneous." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). The decision must be "objectively unreasonable." *Id.* (citing *Williams*, 529 U.S. at 409).

A court may also grant habeas relief if the state court adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). "[S]tate-court factual determination[s] [are not] unreasonable 'merely because [a federal post-conviction court] would have reached a different conclusion in the first instance.'" *Brumfield v. Cain*, 576 U.S. 305, 313–14 (2015) (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)). Rather, factual determinations made by the state court are "presumed to be correct," and the petitioner bears "the burden of rebutting the

presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Even if

"'[r]easonable minds reviewing the record might disagree' about the finding in question, 'on

habeas review that does not suffice to'" overturn a state court factual determination. *Wood*, 558

U.S. at 301 (alteration in original) (quoting *Rice v. Collins*, 546 U.S. 333, 341–42 (2006)). A

court may overturn a state court's factual determination only if the record cannot "plausibly be

viewed" as consistent with the state court's fact-finding or if "a reasonable factfinder must

conclude" that the state court's decision was inconsistent with the record evidence. *Rice*, 546

U.S. at 340–41.

    **b.**   **Sufficiency of the evidence claim**

    Petitioner contends that (1) Judge Bulsara's sufficiency analysis is impaired "by the

assumption that [Petitioner] was connected to the murders by his connection to the crime scene,"

when in fact "there was no evidence of a crime scene at all, much less that it was his apartment."

(Pet'r's Obj. 3.) In support, Petitioner argues that "none of [Jakovleva's] blood was found

anywhere in the apartment" and while "there were specks of [Askerov's] blood on a seat cushion

and on the saddle and carpet under one of the foyer doorways, and a luminol test revealed tiny

specks and wipe-marks on a wall," these findings were not "consistent with a violent struggle

and multiple stabbings and/or the dismemberment of two bodies with a circular saw." (*Id.* at 3–

4.) Petitioner argues that without the connection to the crime scene, "even under the deferential

standard of review of sufficiency of the evidence claims under [AEDPA]," the conviction cannot

stand as the prosecution failed to provide sufficient evidence to prove Petitioner's guilt. (*Id.* at

4–5.)

    "[F]ederal habeas courts must consider a petitioner's federal due process claim that the

evidence in support of his conviction was insufficient to have led a rational trier of fact to find

him guilty beyond a reasonable doubt." *Justices of Bos. Mun. Court v. Lydon*, 466 U.S. 294, 303 n.5 (1984). "[E]vidence is sufficient to support a conviction so long as 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Cavazos v. Smith*, 565 U.S. 1, 7 (2011) (per curiam) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *see also Pilon v. Bordenkircher*, 444 U.S. 1, 2 (1979) (per curiam). The inquiry "focuses on whether *any* rational juror could have convicted." *Schlup v. Delo*, 513 U.S. 298, 330 (1995) (emphasis added). Stated in the negative, "[a] reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if *no* rational trier of fact could have agreed with the jury." *Smith*, 565 U.S. at 2 (emphasis added). This "inquiry does not focus on whether the trier of fact made the *correct* guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit." *Herrera v. Collins*, 506 U.S. 390, 402 (1993).

This "deferential federal standard . . . leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial." *Coleman v. Johnson*, 566 U.S. 650, 655 (2012) (per curiam). Therefore, "[a] reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume — even if it does not affirmatively appear in the record — that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *McDaniel v. Brown*, 558 U.S. 120, 133 (2010) (quoting *Jackson*, 443 U.S. at 326); *see also House v. Bell*, 547 U.S. 518, 538 (2006). This is because "[i]t is the responsibility of the jury — not the court — to decide what conclusions should be drawn from evidence admitted at trial." *Smith*, 565 U.S. at 2. This "limited review" ensures courts "do[] not intrude on the jury's role 'to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Musacchio v. United States*, 577

18

U.S. 237, 243 (2016) (quoting *Jackson*, 443 U.S. at 319).  The "deferential standard" precludes "fine-grained factual parsing" of the record.  *Johnson*, 566 U.S. at 655.  Likewise, "the assessment of the credibility of witnesses is generally beyond the scope of review."  *Schlup*, 513 U.S. at 330.

On federal habeas review, a petitioner challenging a conviction based on the sufficiency of the evidence must satisfy a "twice-deferential standard."  *Parker v. Matthews*, 567 U.S. 37, 43 (2012) (per curiam).  The standard is twice-deferential because "the deference to state court decisions required by [28 U.S.C.] § 2254(d) is applied to the state court's already deferential review."  *Smith*, 565 U.S. at 7 (citing *Renico v. Lett*, 559 U.S. 766, 773 (2010)).  Such "a state-court decision rejecting a sufficiency challenge may not be overturned on federal habeas unless the 'decision was "objectively unreasonable."'"  *Matthews*, 567 U.S. at 43 (quoting *Smith*, 565 U.S. at 2).  "Because rational people can sometimes disagree, the inevitable consequence of this settled law is that [federal] judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold."  *Smith*, 565 U.S. at 2.  When conducting a review for sufficiency of the evidence, "federal courts must look to state law for 'the substantive elements of the criminal offense.'"  *Johnson*, 566 U.S. at 655 (quoting *Jackson*, 443 U.S. at 324 n.16).  The relevant substantive elements come from state law itself, not from the judge's instructions to the jury.  *See Musacchio*, 577 U.S. at 243.

The jury convicted Petitioner of murder in the first-degree.  (Pet. 19; Trial Tr. IV 263:17–20.)  The State Court instructed the jury that, pursuant to section 125.27(1) of the New York Penal Law, to find Petitioner guilty of first-degree murder, the jury must find that the prosecution proved the following five elements beyond a reasonable doubt:

> (1) That on or about November 12th, 1995, in the County of Kings, the defendant, either personally or acting in concert with another person or persons, caused the deaths of Fakhat Askerov and Larisa Jakovleva by stabbing them; (2) that the defendant did so with the intent to cause the death of Fakhat Askerov and the intent to either cause the death or serious physical injury to Larisa Jakovleva; and (3) that the defendant caused both deaths during the same criminal transaction; and (4) that neither victim was a participant in the criminal transaction; and (5) that the defendant was more than [eighteen] years old at the time of the commission of the crime.

(Trial Tr. IV 203:14–204:04); *see* N.Y.P.L. § 125.27(1) ("A person is guilty of murder in the first degree when" "[w]ith intent to cause the death of another person, he causes the death of such person or of a third person" and "as part of the same criminal transaction, the defendant, with intent to cause serious physical injury to or the death of an additional person or persons, causes the death of an additional person or persons; provided, however, the victim is not a participant in the criminal transaction" and the "defendant was more than eighteen years old at the time of the commission of the crime."); *see also Serrano v. Kirkpatrick*, No. 11-CV-2825, 2013 WL 3226849, at *14 (S.D.N.Y. June 25, 2013).

Petitioner does not dispute that the victims were murdered, but argues that the circumstantial evidence adduced at trial was insufficient to support his conviction for their murder. (*See* Pet. 21–35; Pet'r's Opp'n 3–7.) Because of the deferential standard that applies to review of sufficiency-of-the-evidence claims, and the additional deference afforded to state court decisions on federal habeas review, the Court denies habeas relief on this claim.

As a threshold matter, "[a] verdict of guilty may be based entirely on circumstantial evidence as long as the inferences of culpability drawn from the circumstances are reasonable." *United States v. Robinson*, 702 F.3d 22, 36 (2d Cir. 2012) (quoting *United States v. MacPherson*, 424 F.3d 183, 190 (2d Cir. 2005))); *see also Augugliaro v. Bradt*, No. 08-CV-1548, 2014 WL 5093849, at *6 n.5 (E.D.N.Y. Oct. 8, 2014) ("To the extent that petitioner also bases his

challenge to the sufficiency of the evidence on the alleged lack of physical evidence connecting

him to the murder, this argument is meritless.  A conviction 'may be proven entirely by

circumstantial evidence.'" (quoting *United States v. Sureff*, 15 F.3d 225, 228 (2d Cir. 1994))).

In addition, reviewing the evidence presented at trial in the light most favorable to the

prosecution, a rational trier of fact could have found, beyond a reasonable doubt, that the

elements of accessory liability were present.  Immediately after the disappearance of the victims,

Petitioner appeared to have been in a physical altercation, provided inconsistent explanations for

his facial injuries, including that he was robbed by two men one of which he may have killed,

(Trial Tr. II 226:16–21; Trial Tr. III 243:20–244:07), and made false representations regarding

the victims' whereabouts to Iodko, (Trial Tr. II 223:13–15).  In addition, the night the victims

were last seen, Petitioner borrowed Perevorukhova's keys to Apartment 2H, effectively

preventing her from visiting the apartment unannounced until he returned the key approximately

four days later.  (*See* Trial Tr. III 245:04–10, 246:16–247:17.)  At trial, a witness identified

Petitioner as one of two men who purchased a circular saw with Askerov's credit card the day

after the victims went missing and an expert testified at trial that the victims' bodies showed

postmortem dismemberment consistent with the use of such a saw.  (Trial Tr. II 243:09–12,

244:06–13, 245:02–247:21, 248:23–249:04.)  Further, Hall identified Balachov as the man he

saw in New Jersey disposing of the two suitcases containing the victims' dismembered bodies.

(Trial Tr. III 175:1–24.)

Contrary to Petitioner's claim that "there was no evidence of a crime scene," (Pet'r's Obj.

3–4), Perevorukhova testified that the apartment Petitioner shared with the victims had been

cleaned and was missing a rug, and household linens, (Trial Tr. II 248:14–249:16).  In addition,

police found evidence of blood stains in the apartment, and the luminol test revealed "marks

21

illuminated from the wall, from the light switch down to the floor; and on both sides of the light switch there was like semi-circular illumination and, like, splashes or spats."  (Trial Tr. III 28:12–18, 108:10–19, 199:23–202:07, 203:14–205:12.)  Further, as Petitioner concedes, DNA evidence indicated that the blood in the apartment belonged to Askerov, one of the victims, (Trial Tr. III 199:23–202:07), and testimony from both Iodko and Perevorukhova confirmed that Petitioner shared Apartment 2H with Balachov and the victims, therefore connecting Petitioner to the apartment which was determined to be the scene of the crime, (*id.* at 236:23–237:03; Trial Tr. II 214:06–215:25).

This circumstantial evidence, together with Petitioner's departure to Ukraine shortly after the victims disappeared, where he remained for thirteen years, (Trial Tr. III 1115:22–116:09, 120:03–08, 128:04–06), provides a sufficient basis for a rational juror to reasonably conclude beyond a reasonable doubt, that Petitioner murdered Jakovleva and Askerov.  *See Mitchell v. Artus*, No. 07-CV-4688, 2008 WL 2262606, at *19 (S.D.N.Y. June 2, 2008) (finding that although the prosecution's "case relied on circumstantial evidence and [petitioner's] inconsistent and conflicting statements [regarding his knowledge of the victim's death], a rational jury could have found that, combined, this evidence proved beyond a reasonable doubt that [petitioner] was the perpetrator"), *report and recommendation adopted*, 2008 WL 3884373 (S.D.N.Y. Aug. 21, 2008); *Toland v. Walsh*, No. 02-CV-399, 2008 WL 820184, *3 (N.D.N.Y. Mar. 26, 2008) (dismissing petitioner's sufficiency of the evidence claim and finding that a rational trier of fact could have concluded that petitioner was guilty beyond a reasonable doubt based, in part, on "evidence confirming that Petitioner suddenly left Schenectady on August 5, 1995, the day after the murder . . . with a one-way bus ticket" and that "[p]etitioner gave conflicting stories as to why he was with the victim on the night of the murder"); *Torres v. Scribner*, No. 05-CV-1479,

22

2008 WL 5156630, at *18 (E.D. Cal. Dec. 9, 2008) (dismissing petitioner's sufficiency of the evidence claim in finding that based on circumstantial evidence produced at trial, including that petitioner "fled to Mexico and remained there for two years" shortly after the murder, a rational trier of fact could find beyond a reasonable doubt that he was guilty); *People v. Levine*, 65 N.Y.2d 845, 846–47 (1985) (finding circumstantial evidence sufficient to support the jury's guilty verdict, where the defendant "used a credit card belonging to the victim to buy a pair of shoes within two or three hours after the victim had been strangled and stabbed to death" and subsequently made false statements that showed "evidence of consciousness of guilt of some crime"); *People v. Bierenbaum*, 748 N.Y.S.2d 563, 574 (App. Div. 2002) (finding that evidence of false statements, when "taken into account in evaluating all the other evidence," supported the conviction of defendant for second degree murder); *People v. Bennett*, 79 N.Y.2d 464, 469–70 (1992) (noting that "[c]ertain postcrime conduct is 'indicative of a consciousness of guilt, and hence of guilt itself,'" including giving false statements or alibis (first quoting *People v Reddy*, 261 N.Y. 479, 486 (1933); and then collecting cases)).

Although Petitioner seeks to draw alterative inferences from the relevant facts, as Judge Bulsara noted, the various alterative theories based on the circumstantial evidence Petitioner proposes were presented and rejected by the jury at trial.  (*See* R&R 19); *see also United States v. Feng Ling Liu*, No. 12-CR-934, 2015 WL 4460898, at *15 (S.D.N.Y. July 20, 2015) (finding that because "[d]efendant's claims concerning the [sufficiency of the evidence to establish the] conspiracy and her lack of a role in it amount to little more than rearguing points that were made to, and rejected by, the jury . . . they cannot succeed at this juncture").  Accordingly, in light of the Court's deferential review of the sufficiency of the evidence, Petitioner's false statements, and flight to Ukraine, the mere existence of alterative explanations for Petitioner's injuries is

insufficient to warrant habeas relief.  *See Graham v. Lape*, 476 F. Supp. 2d 399, 403 (S.D.N.Y. 2007) ("All permissible inferences are drawn in favor of the prosecution, the verdict can be based entirely on circumstantial evidence, and the government is not required to refute every possible hypothesis supporting the defendant's innocence." (citing *Dixon v. Miller*, 293 F.3d 74, 81 (2d Cir. 2002))); *see also Pacheco v. Gonyea*, No. 14-CV-2286, 2015 WL 10912859, *5 (S.D.N.Y. Nov. 5, 2015) ("[A] court will 'defer[] to the jury's assessments of the witnesses' credibility.'" (quoting *United States v. Arena*, 180 F.3d 380, 391 (2d Cir. 1999), *abrogated in part on other grounds by Scheindler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393 (2003) (alteration in original))).

### c.  Acting-in-concert instruction claim

Petitioner argues that the State Court should not have instructed the jury on acting-in-concert liability because there were two separate criminal transactions at issue — the murder and the dismemberment — and because the prosecution did not submit any count related to the dismemberment to the jury, "the [State Court] could have instructed the jury on acting-in-concert only if the circumstantial evidence of murder involved the possibility of more than one actor." (Pet'r's Obj. 3.)  Petitioner contends that the "improperly given [acting-in-concert] charge relieved the prosecution of its obligation to prove [Petitioner] killed his roommates and may have been an improper basis for [Petitioner's] conviction."[7]  (Pet. 37.)

A petitioner faces "an 'especially heavy' burden" in "seek[ing] to show constitutional error from a jury instruction that quotes a state statute."  *Waddington v. Sarasud*, 555 U.S. 179, 190–91 (2009) (citing *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977)); *see also Hobson v.*

---

[7]  Because Petitioner does not challenge the substance of the jury instruction, the Court considers only whether there was sufficient evidence to support the acting-in-concert charge.

*Wendlend*, No. 11-CV-3225, 2017 WL 4675764 at *8 (E.D.N.Y. Oct. 13, 2017) ("A petitioner

faces an 'especially heavy burden' in attempting to prove prejudice on the basis of an allegedly

erroneous jury instruction." (quoting *Waddington*, 555 U.S. at 190–91; *see also DelValle v.*

*Armstrong*, 306 F.3d 1197, 1200–01 (2d Cir. 2002) ("[T]he [Supreme] Court has held that a state

prisoner making a claim of improper jury instructions faces a substantial burden." (citing

*Henderson v. Kibbe*, 431 U.S. 145, 154 (1977))).  The Second Circuit has "repeatedly held that

'[i]n order to obtain a writ of habeas corpus in federal court on the ground of error in a state

court's instructions to the jury on matters of state law, the petitioner must show not only that the

instruction misstated state law but also that the error violated a right guaranteed to him by federal

law.'"  *Davis v. Strack*, 270 F.3d 111, 123 (2d Cir. 2001) (alteration in original) (quoting

*Casillas v. Scully*, 769 F.2d 60, 63 (2d Cir. 1985)).  Stated another way, to obtain a writ of

habeas corpus based on an error in the state court's jury instructions, "the [petitioner] must show

both that the instruction was ambiguous and that there was 'a reasonable likelihood' that the jury

applied the instruction in a way that relieved the State of its burden of proving every element of

the crime beyond a reasonable doubt."  *Waddington*, 555 U.S. at 191 (quoting *Estelle*, 502 U.S.

at 72); *see also Postell v. Bradt*, No. 09-CV-4853, 2017 WL 1214933 at *4 (S.D.N.Y. Mar. 31,

2017) ("An error in a jury instruction will only be a *constitutional* error if the instruction was

both 'ambiguous and that there was a reasonable likelihood that the jury applied the instruction

in a way that relieved the State of its burden of proving every element of the crime beyond a

reasonable doubt.'" (quoting *Waddington*, 555 U.S. at 191)).  "Because it is not enough that there

is some slight possibility that the jury misapplied the instruction, the pertinent question is

whether the ailing instruction by itself so infected the entire trial that the resulting conviction

violates due process."  *Moronta v. Griffen*, 610 F. App'x 78, 79 (2d Cir. 2015) (quoting

*Waddington*, 555 U.S. at 191)).  "It is well established that the instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record."  *Gordon v. Arcanum Investigations, Inc.*, 646 F. App'x 18, 20–21 (2d Cir. 2016) (quoting *Estelle v. McGuire*, 502 U.S. 62, 72 (1991)).

Where "two or more individuals . . . act jointly to commit a crime, . . . in certain circumstances, . . . those persons can be said to be 'acting in concert' with each other" and "each can be held criminally liable for the acts of the other(s)."  N.Y. Crim. Jury Instructions, Accessorial Liability (2021) (citing *People v. Rivera*, 84 N.Y.2d 766, 771 (1995)).  Under New York law, "a person, although not the principal actor, may nonetheless be criminally liable as though he/she were the principal actor when 'acting with the mental culpability required for the commission thereof, he solicits, requests, commands, importunes, or intentionally aids [the principal] to engage in such conduct.'"  *Rivera*, 84 N.Y.2d at 771 (quoting N.Y.P.L. § 20.00). "[W]hether the defendant was the actual perpetrator of the crime or liable as an accessory thereto is irrelevant.  There is no distinction between liability as a principal and criminal culpability as an accessory and the status for which the defendant is convicted has no bearing upon the theory of the prosecution."  *Jones v. Conway*, No. 05-CV-915, 2008 WL 904899, at *10 (N.D.N.Y. Mar. 31, 2008) (quoting *People v. Duncan*, 385 N.E.2d 572, 576 (App. Div. 1978)); *see also Rivera*, 84 N.Y.2d at 771 ("The key to understanding accessorial liability is that whether one is the actual perpetrator of the offense or an accomplice is, with respect to criminal liability for the offense, irrelevant" (citation omitted)).  Accordingly, the acting-in-concert charge is appropriate where the evidence adduced at trial is sufficient to support accomplice liability, such that the defendant acted with the requisite mental culpability and intentionally assisted the principal actor in the criminal conduct.  *See Rizzo*, 910 N.Y.S.2d at 743 (concluding that the court "properly

instructed the jury on accomplice liability inasmuch as 'there was a reasonable view of the evidence to support the charge'" (quoting *People v. Pierre*, 838 N.Y.S.2d 546, 548 (App. Div. 2007))).

The Appellate Division's determination that the State Court "properly instructed the jury on accomplice liability," *Valenko*, 6 N.Y.S.3d at 143 (quoting *Rizzo*, 910 N.Y.S.2d at 743), was not contrary to, nor an unreasonable application of, clearly established federal law.  Contrary to Petitioner's argument, the acting-in-concert instruction did not "relieve[] the prosecution of its obligation to prove that [Petitioner] killed his roommates," (Pet. 37), as the State Court properly instructed the jury that in order to find Petitioner liable for murder they must unanimously determine, beyond a reasonable doubt, that "the defendant acted with the state of mind required for the commission of the crime, and then either personally or by acting in concert with another person committed each of the remaining elements of the crime," (Trial Tr. IV 196:19–24). Moreover, as detailed above, the circumstantial evidence presented at trial provided sufficient grounds for a rational trier of fact to find that Petitioner acted intentionally in assisting Balachov with the murder of Jakovleva and Askerov, justifying the acting-in-concert charge.  (*See* Trial Tr. II 226:16–21; Trial Tr. III 243:20–244:07 (making false representations regarding his facial injuries); Trial Tr. II 223:13–15 (lying about the victims' whereabouts); Trial Tr. II 243:09–12, 244:06–13, 245:02–247:21, 248:23–249:04 (testimony identifying Petitioner as one of two men who purchased a circular saw with Askerov's credit card and expert testimony that the victims' bodies showed postmortem dismemberment consistent with the use of such a saw); Trial Tr. III 1115:22–116:09, 120:03–08, 128:04–06 (Petitioner's abrupt departure to Ukraine where he remained for thirteen years).)  Based on this evidence, a rational trier of fact could find that

Petitioner intentionally assisted Balachov with the murder of Jakovleva and Askerov, justifying the acting-in-concert charge.

Accordingly, the Court finds that the State Court did not commit error in instructing the jury on accomplice liability, nor did the Appellate Division unreasonably apply clearly established federal law in affirming Petitioner's conviction.  As Petitioner fails to establish that the acting-in-concert charge violated his constitutional right to due process, no habeas relief is warranted.  *See Davis*, 270 F.3d at 123 ("[T]o obtain a writ of habeas corpus in federal court on the ground of error in a state court's instructions to the jury on matters of state law, the petitioner must show not only that the instruction misstated state law but also that the error violated a right guaranteed to him by federal law." (quoting *Casillas v. Scully*, 769 F.2d 60, 63 (2d Cir. 1985))); *see also Moronta*, 610 F. App'x at 79 (stating that the court may not grant habeas relief as to the alleged error in jury instruction "unless the state courts' 'adjudication of the claim . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" (quoting 28 U.S.C. § 2254(d)(1))).

**III.   Certificate of appealability**

Having denied the petition for a writ of habeas corpus, the Court denies a certificate of appealability for Petitioner's claims.

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  Rule 11(a) Gov'g § 2254 Cases in U.S. Dist. Cts.  A court must issue a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  This means that a habeas petitioner must demonstrate "that reasonable jurists could debate whether (or, for that matter, agree that)

the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)). "This threshold question should be decided without 'full consideration of the factual or legal bases adduced in support of the claims.'" *Buck v. Davis*, 580 U.S. ---, ---, 137 S. Ct. 759, 773 (2017) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003)). "Obtaining a certificate of appealability 'does not require a showing that the appeal will succeed,' and "[courts] should not decline the application . . . merely because [they] believe[] the applicant will not demonstrate an entitlement to relief." *Welch v. United States*, 578 U.S. ---, ---, 136 S. Ct. 1257, 1263–64 (2016) (quoting *Miller-El*, 537 U.S. at 337). In fact, a certificate of appealability may issue even if "every jurist of reason might agree, after the [certificate of appealability] has been granted and the case has received full consideration, that petitioner will not prevail." *Miller-El*, 537 U.S. at 327.

The Court denies a certificate of appealability as to Petitioner's sufficiency of the evidence claim because no reasonable jurist could find that the conviction was not sufficiently supported by the circumstantial evidence produced at trial for reasons detailed above. *Cavazos*, 565 U.S. at 7 ("[E]vidence is sufficient to support a conviction so long as 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" (quoting *Jackson*, 443 U.S. at 319)).

The Court likewise denies a certificate of appealability as to Petitioner's claim that the State Court violated his right to due process by giving the acting-in-concert charge as no reasonable jurist could find that the Appellate Division unreasonably applied clearly established federal law in determining that there was sufficient evidence adduced at trial to support the

acting in concert charge.  *See Jones*, 2008 WL 904899, *10 ("Viewed in the context of the overall charge, the trial court did not commit an error during jury instructions that violated due process.  Accordingly, the Appellate Division's determination was not contrary to, nor did not involve an unreasonable application of, clearly established federal law.").

**IV.   Conclusion**

The Court adopts the R&R in its entirety pursuant to 28 U.S.C. § 636(b)(1).  Accordingly, the Court denies the petition.  The Court also denies a certificate of appealability for all claims.  The Clerk of Court is respectfully directed to mail a copy of the decision to Petitioner and close this case.

Dated:  September 16, 2021
        Brooklyn, New York

                                                  SO ORDERED:


                                                  ___s/ MKB_____
                                                  MARGO K. BRODIE
                                                  United States District Judge